# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

_____

MELVIN DAVIS SR,
CHARASE DORSEY,
ANISHA BIRD,
VIRECE BERRY,
KARL COTTON SR,
SON OF MAN INC.
TEMESIA DAVIS,
JASMINE MCCOY,
DANIELLE WASHINGTON,
RAVEN J. WRIGHT,
QUANTILA ROBERTSON,
Next Friend for R.R.,
IESHIA BLACKWELL,
Individually and as
Representative of the
Estate of CARL COLEMAN,
and all others similarly situated.

     Plaintiffs,                    Case No.

v.                                Hon. Chief Judge Hala Jarbou

COUNTY OF BERRIEN;
BERRIEN COUNTY PROSECUTING
ATTORNEY STEVE PIERANGELI,
Individually and in his Official Capacity;
ASSISTANT PROSECUTING
ATTORNEY MARK SANFORD,
Individually and in his Official Capacity;

TAYLOR KOCH, Individually and in
her official capacity; BERRIEN COUNTY
SHERIFF L. PAUL BAILEY, Individually
and in his Official Capacities; DETECTIVE
JEREMIAH GAUTHIER, Individually,
and in his Official Capacity; DEPUTY
SHAWN YECH, Individually and in his
Official Capacity; DEPUTY JACOB
WILL, Individually and in his Official
Capacity; DEPUTY JONATHAN
BOWMAN; In his Official Capacity;
CITY OF BENTON HARBOR;
BENTON HARBOR PUBLIC SAFETY
DIRECTOR, DANIEL E. MCGINNIS
JR.; Individually and in his Official
Capacities; BENTON HARBOR
HOUSING COMMISSION; CINDY
DRAKE-COLLIER, in her Official Capacity;
BENTON CHARTER TOWNSHIP;
OFFICER JOHN VISEL, Individually
and in his Official Capacity; LT. DT. MICHAEL
DENDOOVEN, In his Official Capacity;
STATE OF MICHIGAN; MICHIGAN STATE
POLICE; DETECTIVE WILLIAM ASHLEY,
Individually and in his Official Capacities;
MICHIGAN DEPARTMENT OF HEALTH
AND HUMAN SERVICES; REBECCA WRIGHT,
Individually and in her Official Capacities;
CONTINENTAL MANAGEMENT LLC;
REGIONAL MANAGER STEVE COOK,
Individually and in his Official Capacity;
KEVIN MACKIN, Individually and in his Official
Capacities; CALEB GRIMES, Individually
and in his Official Capacity; SECRETARY
MARCIA L. FUDGE, In her Official

Capacity; DEPT. OF HOUSING AND URBAN
DEVELOPMENT, and any yet to be discovered
liable parties.

     Defendants.

## PLAINTIFFS' CLASS ACTION COMPLAINT AND REQUEST FOR DAMAGES

There are no other actions before the Court which arise out of the same transactions and occurrences as stated herein at this time.

### (1)

These Plaintiffs, natives and residents of Benton Harbor, MI, located within the County of Berrien, through counsel, comes and brings this action for violations of the United States Constitution and federal law against the named Defendants; primarily: violations of the First Amendment, Fourth Amendment, and Fourteenth Amendment due process, equal protection clause, constituting conspiracies to violate civil rights, malicious prosecutions, wrongful arrests, intentional discrimination, and disparate treatment.  This complaint is brought by the eleven named Plaintiffs on behalf of approximately twenty-one thousand African American residents in the County of Berrien and subject to its custom of racial animus at issue. The named Plaintiffs have suffered constitutionally tortious injuries as a consequence of the on-going habitual custom of racial animus established by

the Berrien County Municipality.  The Plaintiffs assert that these violations of their unalienable constitutional rights were caused by the Defendants' repugnant, deliberate misconduct, neglect of duty, and custom of racially discriminatory indifference to definite injuries of Black American citizens in Berrien County.

(2)

This is a civil action asserting claims under the Constitution and federal law alleging violations of the U.S. Constitution, and federal civil rights laws. The Plaintiffs assert they are suffering from a custom of intentional racial discriminations, and condonement of that racial animus custom by the County of Berrien. Plaintiffs assert that this custom has been acted out in conspiracies to violate their civil rights, causing them to suffer unlawful searches and seizures, malicious prosecutions, wrongful imprisonment, denial of government programs, severe emotional distress, and regular nuisances.  Due to their egregious releases of hazardous air pollutants causing adverse environmental effects, the Plaintiffs assert that these Defendants are in violation of the U.S. Const. Amend. I,  U.S. Const. Amend. IV,  U.S. Const. amend. V, U.S. Const. amend. VI, U.S. Const. Amend. VIII, U.S. Const. amend. XIV, 29 U.S.C. § 794, 42 U.S.C. § 1437, 42 U.S.C. § 1437f, 42 U.S.C. § 1981(c), 42 U.S.C. § 1983, 42 U.S.C. §

1985(3), 42 U.S.C. § 2000a, 42 U.S.C. § 2000d,  42 U.S.C. § 3604, 42 U.S.C. § 3608(e)(5), 42 U.S.C. § 12132, 24 C.F.R. § 5.703(1), 24 C.F.R. § 92.209, 24 C.F.R. § 92.504, M.C.L. § 600.2907, M.C.L. § 600.2912, and several other laws.  The Plaintiffs requests a jury trial and seeks exemplary, compensatory, and equitable relief, as well an award of reasonable attorney fees and cost pursuant to the U.S Constitution, 29 U.S.C. § 794a, 42 U.S.C.A. § 1983, 42 U.S.C. § 12202, 42 U.S.C. § 12133, 42 U.S.C. § 1404a, 42 U.S.C. § 1437z-1(a)(1), 42 U.S.C. § 3613(a)(1)(A), 24 C.F.R. § 35.96, M.C.L. § 600.6305, and M.C.L. § 691.1755.

(3)

## JURISDICTION AND VENUE

This Court has jurisdiction over all causes of action set forth in this complaint pursuant to 28 U.S.C. § 1331, 28 U.S.C § 139, Fed. R. Civ. P. 18, and  Fed. R. Civ. P. 19 as the plaintiffs pose federal questions of law and the Defendants reside in the Counties of Berrien in the State of Michigan.  The occurrence of the significant and relevant incidents giving rise to this complaint took place in Benton Harbor, MI, County of Berrien, within the jurisdiction of this Court.

(4)

## **THE PARTIES**

Plaintiffs are citizens of the State of Michigan and reside in the City of Benton Harbor, MI, in the County of Berrien.

(5)

## **THE DEFENDANTS**

Defendants County of Berrien, Berrien County Prosecutor Steve Pierangeli, Berrien Co. Assistant Prosecutors Mark Sanford and Taylor Koch,  former Sheriff Leonard Bailey, Detective Jeremiah Gauthier, Deputy Jacob Will, Deputy Jonathan Bowman, City of Benton Harbor, Benton Harbor Public Safety Director Daniel E. McGinnis, Benton Charter Township, Benton TWP Police Officer John Visel, Lt. Detective Michael DenDooven, State of Michigan, Michigan State Police Detective William Ashley, Michigan Department of Health and Human Services, CPS Agent Brittany Wright, Attorney Caleb Grimes, and former Berrien County public defender Kevin Mackin, HUD Secretary Marcia L. Fudge, Continental Management LLC., and Steve Cook are private individuals, public officials, government agents, municipal, and corporate entities with active places of business and ongoing operations in the County of Berrien, within the jurisdiction of this Court.  All defendants are entities, or employees of entities, receiving federal funds for

the administration of public programs and institutions like County courts, public safety, public criminal defense, and human health services.

(6)

## FACTS GIVING RISE TO COMPLAINT

Racial Animus against Black Americans has a long and storied history in Berrien County.  For decades, Black American residents in the County have pleaded for assistance and relief from tortious discrimination in public services, prompting the recent reestablishment of the Niles-Buchanan chapter of the NAACP.  In the performance of public services like policing and the administering of government programs like home-help medical care, low income housing, or child protective services, Black Americans in Berrien County are regularly denied equal access to the same quality and process of services as other residents.  Oftentimes racial bias and vendettas are carried out by State agents using their delegated governmental powers as their tools of retribution.  From vigils to mourn residents after their being found under suspicious circumstances in the St. Joseph river, to riots in response to decades of discriminatory policing, nothing has seemed to cause a serious addressing or remediation of the racial animus custom within the County.

(7)

These issues of racial animus are long standing. Over thirty years ago, then sixteen year old Benton Harbor High School student, Eric McGinnis, was found deceased in the St. Joseph River in 1991.  Eric McGinnis was last seen being chased by a group of white men in St. Joseph.  Despite the incident occurring while witnesses watched, the murder was ruled an accident with no foul play until someone came forward thirty-one years later.  In 2022, the case was ruled a homicide.  A special investigator, despite the witness stating he seen four white men chasing Eric McGinnis, ruled that their wasn't enough evidence to go after the other three, alleging the primary culprit committed suicide twelve years after he and his friends murdered young Eric.  Plaintiffs assert that if the incident had been racially opposite, and Eric McGinnis had been a Caucasian instead, there would be three Black men serving prison sentences for their roles in his death.  Because Eric McGinnis was Black American, his case was not investigated for three decades, and even when it was ruled a homicide, complete justice was not pursued.  Eric McGinnis serves as one of the most well known incidents of racial discrimination in Berrien County, but far from the only. (See Exhibit A, McGinnis Homicide Ruling Article).

(8)

Throughout the nineteen nineties, Black communities and neighborhoods in Berrien County were flooded with external police officers while local police budgets were diminished by the County.  The external Berrien County Sheriffs, Michigan State Police officers, and federal agents that came into the Benton Harbor community essentially hunted young Black residents like animals and acted egregious discriminatory policing for years, culminating in the 2003 Benton Harbor riots, a two-day state emergency that brought the state guard to the small southwestern Michigan city.  Two-years later it was revealed that local police officers, prosecutors, and judges were participating in wrongfully imprisoning hundreds of people.  "Former officers Andrew Collins and Bernard Hall served federal prison time on charges related to planting drugs on people and falsifying documents between July 2006 and January 2008.  Both men have completed their prison sentences.  There have been 26 civil cases brought by almost 90 people saying they were wrongfully arrested. Some of the plaintiffs said they were wrongfully convicted based on the fraudulent evidence, while others pleaded guilty to lesser charges to avoid long prison terms. Some served prison time and had to pay thousands of dollars in fines, court costs and fees." (See Exhibit B, Collins Saga Article).

(9)

The judges and prosecutors who participated in the wrongful convictions and imprisonments were not held accountable for their roles. The broad immunity enjoyed by judicial institutions has cast a shadow over justice in Berrien County. Most, if not all court officers involved and implicated in the scandal retained their positions and powers to further discriminate against Black American residents. Counsel, as a law student, had the privilege of attempting to assist one of the Collins victims who did not get the opportunity to file a lawsuit. DeMyron Robinson, framed by Andrew Collins in 2005, is currently serving out a federal drug conviction after having his second drug conviction sentence enhanced by his initial bogus Berrien County conviction. Andrew Collins, after serving his time in federal prison, agreed to assist with an appeal for Mr. Robinson. According to Andrew Collins, he learned that the racial animus customs of Berrien County were being protected by State and Federal actors when investigators informed his former superiors and law enforcement colleagues that he attempted to bring light to their behavior. He further confirmed that the issue was widely known and the County was indifferent to the injuries that its' racial animus traditions cause. In a 2012 deposition, Andrew Collins described his working relationship with Berrien County prosecutors as being

more than friends, better described as a personal "confidant", and described how he was directed to sign the Prosecuting Attorney's name on warrant request forms.  He also detailed how a narcotics officer dated the prosecutor who also served as his personal confidant.  Given the relationship between law enforcement and prosecutors, the custom of falsifying records and taking other nefarious actions for the sole purpose of injuring Black residents was spoken to and talked about in confidence by Berrien County agents over a decade ago.  (See Exhibit D, Collins Deposition Excerpts).

(10)

Many of the people affected by the Collins-Hall scandal refused to seek compensation out of fear of retribution from Berrien County judicial and law enforcement community, fearing what would happen to their family members the next time they went before a judge or were stopped by police riding around in the city.  Government agents in Berrien County are known to be vindictive if challenged; regularly using their positions and delegated powers in conspiratorial collaboration to punish Black Americans citizens for no other reason than their skin-tone.  Before the Collins-Hall civil case fallout could conclude, another Benton Harbor resident, Timothy "Bulldog" Allen, was found in the St. Joseph River a week after asking St. Joseph City

police officers for a ride across the bridge back to Benton Harbor.  After being denied, he was forced off of hospital grounds and again denied a request to be watched safely across the bridge.  The community still suspects foul play, as Bulldog was last seen communicating with Police Officers before going missing and being found deceased in the river.

(11)

Berrien County is plagued by customs of both intentional and disparate discriminatory treatment.   Cory McFall, was convicted of murder and sentenced to life without parole, served sixteen years in prison, only to be released after Thomas Cooley Law School and the Michigan Conviction Integrity Unit's investigation led to his release.  Cory McFall had a verifiable alibi and available witnesses when Berrien County Prosecutors forged ahead with incarcerating him for life.  Mr. McFall and his family are just one set of victims who have been injured by Berrien County's absence of adequate legal representation and its customary overzealousness and unchecked racial bias in prosecuting Black Americans residents in the County.   Undergirding the horrors that have occurred in the Berrien County jails and courthouses is the Defendant County's discriminatory law enforcement funding.  For the past decade or longer, Berrien County has been discriminatorily dispersing

police funding throughout the County, spending over a million dollars to support police in multiple white communities, but only spending a fraction of that to support policing in Benton Harbor, MI. Only Buchanan Township received less money from the "Local Law Enforcement Contract Fund" (Exhibit E, Berrien County Annual Budgets). While receiving virtually nothing from Berrien County in comparison to the law enforcement funding given to the Caucasian municipalities, Benton Harbor residents make up the bulk of those pursued and arrested by law enforcement officers in Berrien County. While the county sends most of its law enforcement funding elsewhere, it makes a point to focus on criminals in Benton Harbor, where it doesn't fund policing nearly as much as it does in New Buffalo or Niles Township. However Berrien County determines to payout its contributions, it intentionally dispenses Benton Harbor around three percent (3%) of Berrien County's Local Law Enforcement Contract Fund, while arresting Benton Harbor citizens at three times their population rate in the County. Berrien County intentionally discriminates against Black residents by underfunding law enforcement in Black Communities while making their residents the bulk of those arrested and prosecuted in the County. By underfunding law enforcement patrols in Benton Harbor/Benton Township, Berrien County intentionally makes the area more dangerous.

Simultaneously though, external law enforcement departments like the Berrien County Sheriff's and Michigan State Police troopers come into the community and arrest Black residents at three times their population rate. Berrien County pays only three percent of its Law Enforcement fund to majority Black communities, but creates a jail population that is regularly fifty-five percent Black or higher.  Thanks to a recent study, Berrien County's custom of racial animus can now be viewed in the form of clear racial disparity statistics.

(12)

The national turmoil around George Floyd and the community's continued anguish from the unsolved Eric McGinnis case, and Berrien County's long history of racial animus, prompted the local organizations to consult Andrew University to study racial disparity in Berrien County.  The study concluded what residents already knew: "Black people are incarcerated in the Berrien County jail at triple their percentage in the county's population", despite the majority of the County's law enforcement funding going elsewhere.  Berrien County, through its Sheriffs and resident Michigan State Troopers, does not seek to arrest criminals where it invests its funding; Berrien County directs its officers to the predominantly minority neighborhoods that it barely invest

14

in, to pursue, charge, convict, and fine citizens regardless if they are actually guilty of crimes or not.  The Andrews University study asserted that "Other research suggests that this might be due to the influence of specific implicit biases held at individual levels, but may also be enforced by systemic racism instilled by larger communities," said Kristen Wietzel, an associate Professor of Sociology at Andrew University, who worked on the study with other academics. (See Exhibit E, Racial Disparity in Felony Bookings).  The larger community, Berrien County, is systemically underfunding and over-policing its Black communities, i.e., enforcing a system of racism, while knowingly protecting and sustaining customs of both intentional and implicit racial bias on the individual government agent level and systemic county practices on a larger level.  When police officers or government agents abuse citizens, prosecutors and government agencies use their powers and positions to protect their fellow agents by conspiring against and denying the rights of Black citizens, and further remaining indifferent to the injuries they cause in the process.

(13)

In response to consistent community complaints and the BHPD Collins-Hall scandal, in which Defendant Berrien County contracted local private

attorneys at ten thousand dollars a year causing a custom of insufficient legal representation, the State of Michigan established and funded the Berrien County Public Defender's office.   While a state funded public defender's office was much needed, these Plaintiffs assert that its purpose crumbled under the heavy pressure of the racial animus customs permeating from the Berrien County Courthouse.   Residents report that when given legal directions for their defense, Berrien County Public Defenders serve the Berrien County Court, not their clients.   Plaintiffs assert that in spite of how strong their defense may be, Berrien County Public Defenders take actions to suppress the building of a defense in favor of swift plea bargain adjudication before the Court.   Multiple residents allege that their public defenders worked against them in collaboration with prosecutors and judges to cause personal injuries and financial losses.   Other Plaintiffs allege they asserted some right in the administration of a government program and were subsequently punished by their case manager or federal program administrator as a result.   Government agents in Berrien County act according to the customs of racial animus permeating from the Berrien County Courthouse.

(14)

Long time Berrien County Judge Charles Lasata was recently reprimanded and admonished by the Michigan Judicial Tenure Commission for being emblematic of the racial animus customs injuring Black American residents in Berrien County.  On December 21st, 2023, the Detroit Free Press reported that "In a five-page letter dated Dec. 12 responding to a request for the commission to investigate alleged misconduct by LaSata, the commission's chair laid out how LaSata over the course of a decade violated Michigan's code of judicial conduct and failed to comply with court rules."  The article goes on to note: "LaSata, the commission review found in its review, "disparaged criminal defendants in personal terms," required cash bonds in cases when a court rule required releasing defendants pretrial on personal recognizance and he improperly ordered defendants incarcerated for failing to pay fines and fees." (See Exhibit F, Judge Lasata Admonishment Article). It is under these constant conditions that Berrien County Public Defenders are alleged to have directly collaborated with opposing counsel and judges against their own clients and Berrien County Jail deputies are now alleged to be beating citizens and maintaining a sex for commissary scheme with female inmates.  This Berrien County custom and culture of inhumane abuse and disregarding the rights and dignity of Black American citizens has become pervasive and blatant.  Berrien County Jail and Courthouse are

regularly used like tortious toys by police officers and other officials of the Court.  The custom of indifference to rights evidenced by Judge Lasata's admonishment letter permeates throughout Berrien County and empowers all government agents to act in kind, as they please, in particularly when dealing with Black American residents.

(15)

Despite the decades of racial discrimination issues in the Berrien County Courthouses and jails, Berrien County as a municipality has done little to acknowledge or remedy the types racial animus-based injuries surmised in this complaint.  These Plaintiffs and their sufferings are also emblematic of the injuries being suffered by residents not named on the face of this pleading.  Pursuant to the federal rules of civil procedure joinder rules, Plaintiffs seek to join these Defendants and claims into a solitary class action complaint against Defendants Berrien County, the State of Michigan, and their respective co-defendant municipalities and department agents.

(16)

**PLAINTIFF MELVIN DAVIS SR.**

**Due Process/Equal Protection Violation, Racial Discrimination, and Negligence**

**U.S. Const. Amend. XIV ; 42 U.S.C. § 2000a ; 42 U.S.C.  § 2000d**

**Defendants Berrien County, State of Michigan**

(17)

Plaintiffs reallage paragraphs 1-17.

(18)

In 2002, Plaintiff Melvin Davis Sr. was a standout high school athlete at Benton Harbor High School. During his junior year, he fathered his first child. The first time Mr. Davis's file came across a Berrien County Courthouse agents desk, he was a seventeen year old young Black man.  In the next five years, Mr.Davis would go on to father two more children and ultimately was placed on child support for those children also.

(19)

When Mr. Davis entered college and in spite of not having any real income outside of a federal financial aid package, he was ordered to pay upwards of eight hundred dollars a month in child support as a full time college athlete. Plaintiff asserts that there was no plausible calculation under the relevant child support formula at the time that could equate to an under-employed college student being ordered to pay over eight hundred dollars in child support.  As result of the erroneous child support order, Mr. Davis suffered several child support warrants that negatively affected his life.  Mr. Davis

was arrested, lost jobs, and ultimately had to leave college to earn money to maintain his freedom.   In one incident at Berrien County Courthouse, a caucasian man went before the judge just before Mr. Davis, and was granted a "pay hold" because he didn't have a job, essentially pausing his child support payments obligations until he was able to secure work.  Mr. Davis, who went before the judge next, and who was in the exact same situation as the caucasian man before him, was told to "figure it out", by that same judge, causing him to continue to be arrested for failing to fulfill his child support obligations.  These Plaintiffs assert that the Berrien County Friend of the Court, other Berrien County government agencies, and their agents regularly use their discretion distinctively differently and detrimental to Black Americans while using the same discretion to support and protect similarly situated Caucasian citizens.  Berrien County government agents habitually use their state powers to injure and disrupt the lives of Black American citizens in this district.

(20)

From 2008 to 2012, Mr. Davis's eldest child was placed in protective custody, at which time her child support payment order was supposed to be paused.   While Mr. Davis could not contact or be aware of his child's whereabouts, and against child support regulations, he was forced to pay

funds for his eldest child to maintain his freedom.  On a  April 13th, 2021

"Michigan Child Support Enforcement System NCP Financial Detail Report,

Mr. Davis's eldest child's scheduled emancipation date is listed as August

22nd, 2020, with the "Docket Status" listed as open, "Case Status" listed as

open, but with the "Actively Charging Obligation" listed as "N."  Contrary

to the "Docket Details" listed on page one of the Financial Detail Report,

Mr. Davis checks were garnished for account "2004000445" and "Amount

Distributed by Docket" reports detail random distributions up until March

29th, 2021.   On February 8th, 2022, the Office of the Friend of the Court

sent Mr. Davis a letter informing that the Office was "in receipt of an

adjustment" regarding his child support, and as a result, that his account had

been credited $628.88 for the following reason. The Office asserted that

"Arrears forgiven in the amount of $628.88."  The Office further asserted

that Mr. Davis was awarded a "Credit of 300.38 on service fees and 328.50

given on processing fees" totaling the $628.88.  Within twenty-one days of

receiving the February 8th, 2022 letter, Plaintiff responded to the Office

through counsel to inform them that he did not agree with their adjustment,

as he asserts that his initial payment calculation orders were erroneous,

excessive, and punitive in nature.  Mr. Davis also asserts that his wages were

garnished while his child was placed in protective custody and his payment

order was supposed to be suspended during that four year period.  As such, Mr. Davis rejected the Office's adjustment because it failed to account for the excessive payment orders, discrepancies between amounts garnished and amounts "distributed by docket", the protective custody period, and any other relief that Mr. Davis was owed under law.  Furthermore, the Office's suggested adjustment failed to account for garnishments taken after account "2004000445" emancipation date.

(21)

Plaintiff Melvin Davis asserts that he and other Black American Benton Harbor fathers have suffered from erroneous and excessive child support calculations, leading to warrants, arrest, and various injuries to their mental and financial stability.  Mr. Davis asserts that in his dealings with the Office and their agents, he was addressed with animosity, angst, disparaging remarks, and at every opportunity, agents used their discretion in a manner detrimental to his interest.

(22)

**PLAINTIFF KARL COTTON SR.**

**Due Process/Equal Protection Violation, Racial Discrimination, Disability Discrimination, and Negligence**

**U.S. Const. Amend. XIV ; 42 U.S.C. § 2000a ; 42 U.S.C.  § 2000d ; 42**

**U.S.C. § 12132**

### Defendants Berrien County, State of Michigan

(23)

Plaintiffs reallage paragraphs 1-23.

(24)

Mr. Cotton established his non-profit, "Son of Man Inc." to contribute home care services to disabled persons like himself while still being able to earn income as the owner-operator of certified service provider.  In 2019 Mr. Cotton was providing services through "EDNA" Medicaid/Medicare as a Non-Profit Corporation.  EDNA wouldn't allow him to use his EIN or TIN for Son of Non-Profit and forced him to use his social security number to receive payments for his employee providing care services to his mother. For this reason, he says he was mistaken as an individual provider instead of a corporate service provider.

(25)

On July 15th, 2020  Mr. Cotton was denied as a Home Help Services Agency by the Michigan Department of Human Health and Services.  On page 2 of document "20-004814", it details: "With respect to the reason for denial…You are currently being paid as an individual caregiver for another

person who is receiving home help services."  Mr. Cotton asserts that was never the case and that he has only and always been listed as an agency provider and never as an individual.  The Plaintiff asserts that MDHHS workers accused him of "double dipping" by being a medicaid recipient receiving home help services, while simultaneously seeking payment from the State as a Home Help Agency Provider, as is his right under law.  Mr. Karl Cotton alleges that the Department denied his right to participate because he was a medicaid recipient and used the "individual caregiver" mishap as a pretextual excuse to deny his application, causing him to suffer mental anguish, loss of income, and the burden of unnecessary and bad faith appeals litigation.

(26)

In a May 14th 2021 letter, the Michigan Department of Licensing and Regulatory Affairs (LARA) and Michigan Office of Administrative Hearings and Rules (MOAHR) Supervisory Administrative Law Judge Marya A. Nelson-Davis notified Plaintiff Karl Cotton of her "Order to Vacate Dismissal And To Schedule Matter For Prehearing Conference. During the appeals process of MDHHS decision to deny his participation, Mr. Cotton was scheduled for a teleconference hearing when he requested an in person hearing.  When he failed to appear for the teleconference hearing,

his appeal was dismissed.  Having never been enrolled as an individual

provider, Mr. Cotton refused to give up his missionary quest to provide

home help services as an agency and ultimately was granted the right to

participate, albeit on different and randomly changing terms.  Mr.Cotton has

suffered repeated hurdles to establishing and maintaining his home help

agency.

(27)

After being mislabeled as an individual provider, Mr. Cotton's status as a

medicare recipient was then used as an excuse to disallow his agency.  In

response to a status update request, Mr. Cotton was forwarded this internal

MDHHS message which verifies that his status as a medicaid recipient was

repeatedly used to deny or frustrate his status as home help agency owner

and operator, despite the regulations allowing for him to do so.  The

MDHHS email to Mr. Cotton reads: "Thank you for reaching out for a status

update. Please see the response below: Thank you for sending that along! I

reviewed Mr. Cotton's case and I can provide an update/info on the

selections he made on his ROI: Food Assistance – Mr. Cotton does not have

active Food Assistance Program benefits and has not applied in recent years.

He can apply anytime online (www.michigan.gov/mibridges) or via physical

application:

https://www.michigan.gov/mdhhs/0,5885,7-339-71551_7338-69226--,00.ht ml State Emergency Relief – Mr. Cotton does not have pending SER benefits and has not applied in recent years. He can apply if there is a need. Adult Services – There is a note from October 2020 from the caseworker that Mr. Cotton called in disputing the assigned Administrative Law Judge to his Adult Services hearing. Hearings are handled under the MOAHR in LARA and questions about his hearing and the proceedings will need to be directed there. It might be helpful to reach out to a LARA constituent services liaison to answer questions about this.  If he is trying to get Adult Services now and is having difficulties reaching an Adult Services worker, please let us know and I will gladly reach out.  Medicaid – Mr. Cotton has active Medicaid, Medicare, and Medicare Cost Sharing (paying Part B Premium).  That said, I have looped in our LARA specialist for further assistance on the hearing issue. I hope this information is helpful.  Best regards, Sav Danbert, Issue Specialist, Office of Governor Whitmer: (517) 335-7858 – she/her/hers.”

(28)

After being denied in 2020, Mr Cotton was received a letter dated April 2nd, 2021, in which the MDHHS-MSA Home Help Provider Department informed him that his “agency is all set to provide services.”  Unfortunately,

this was not the case because Mr. Cotton's agency was denied equal payment due to arbitrarily created reasons.  After being cleared to participate as a Home Help Agency, organizing service providers for patients in Benton Harbor, MI, Mr. Cotton was first denied equal pay because MDHHS workers in the Berrien County department deemed him a "double-dipper", by both receiving medicare benefits as a patient and payment as a home help agency owner.  After months of back and forth and substantial mental and emotional anguish, Mr. Cotton proved that he was never registered as an individual provider and that his status as a medicare recipient and home help services patient, did not preclude him from registering and administering a home help services agency.

(29)

After years of fighting with MDHHS to accept his agency, Mr. Cotton has since suffered several barriers to maintaining his agency.  Despite the Plaintiff being qualified and determined to receive approximately $18 per hour, Berrien County's MDHHS used unaccepted "invoices" and arbitrarily changing invoice requirements to deny the Plaintiff equal pay.  Pursuant to program policies, a MDHHS worker was required to train the Plaintiff, informing him how to fill out and file the required paperwork to receive payments.   Mr. Cotton requested training assistance for his invoice

submissions, but the Department refused to accommodate him by sending a worker out to meet him and attempted to explain the process through email and over the phone despite vision and hearing comprehension issues.  Mr. Cotton was informed that he could submit his invoices electronically which turned out to be untrue.  Furthermore, the Department refused to provide samples of properly filled out invoices to the Plaintiff to assist him in correctly submitting his invoices.  MDHHS also failed to accommodate the Plaintiff's eye disability by failing to provide paper copies of correspondence and forcing him to attempt to read emails on screens and submit invoice verifications online without assistance.  As a result of failing to properly submit his invoices, Mr. Cotton was sanctioned and put on a probationary period, at the end of which, he was again denied equal pay. The Department only paid the Plaintiff's agency $12.24 to $12.45 per hour for his workers, leaving the agency without any profits to operate.  In order to reinstate the Plaintiff's $18, the Department informed the Plaintiff that he needed two months of payments for each worker before they could be paid $18 an hour. Mr. Cotton sought clarification of this never before state requirement and his "ASW" Department agent stated that she didn't know anything about invoices"

(30)

While going through the invoice issues with MDHHS, State agents attempted to poach his employees and deter them from working with his Son of Man agency.  MDHHS workers deterred Son of Man employees from working with Mr. Cotton by telling them that he didn't know what he was doing and directing them to register with other agencies. Jasmine McGee is one such employee who was directed to register with a different agency due to Mr.Cotton's consistent disputes with MDHHS determinations and their refusals to provide training or sample documents.  MDHHS agents also repeatedly Informed his worker Tina and others that they could "call-in" to register with his agency as a services provider, but they were actually required to do so online. Joyce Patrick MDHHS provider program analyst noticed discrepancies.

(31)

In addition to being denied equal payment for his workers, MDHHS agents informed Mr. Cotton that he was not allowed to recruit workers or patients for his agency.  Despite several requests for patient and employee referrals, no workers or patients were ever referred to the Plaintiff's agency by MDHHS.

(32)

In 2023, the Plaintiff's hourly allowance to receive services as a patient was dropped to forty hours a week, and then raised to fifty hours, and again to sixty nine hours and fifty two minutes.  The Plaintiff believes that his hourly allowance as a patient was reduced because someone within the agency did not want him to earn compensation from providing services to himself as a patient through his own home help agency, for which he would receive compensation as the organizer.  Despite MDHHS worker Allison Allen clearing the Plaintiff's Son of Man agency after receiving all of the documents requested, she assigned his agency a $12.45 pay rate instead of the $18.

(33)

On June 11th, of 2023 the Plaintiff appealed the withholding of funds from his company and sought clarification of process and procedures, but never received a response from MDHHS.  In July of 2023, the Department made its payroll obligations more stringent while workers regularly reported being unaware of their job requirements and obligations to the Plaintiff,  like invoice training or document samples.  The Department told Mr. Cotton that he needed to provide them with two months of back payroll records for months that he was determined to receive $12.45.  Mr. Cotton asserts that the Department randomly imposed the payroll obligation upon and did not

allow him sufficient time to attain payroll services and used the requirement

to continue to deny him the pay rate required to be profitable and

competitive with other agencies.  The Plaintiff asserts that he could not meet

payroll obligations because he was not paid properly by the Department and

had to pay workers out of his limited personal funds.

(34)

MDHHS worker Allison Allen spoke with Mr. Cotton's mother, and she

informed Allison Allen that the Mr.Cotton's Son of Man agency was

providing her services.  Despite that fact, Allison Allen later recorded in

Department paperwork that Mr. Cotton was not providing his mother's

services, which caused the Agency to miss payments it had earned,

(35)

Being disallowed from advertising his agency's services while not receiving

any referrals from the Department, MDHHS, sent the Plaintiff's brother a

letter informing him that a services provider was being paid for providing

him services and that they would be switching his services over to Mr.

Cotton's Son of Man agency once his invoices were correct.  The Plaintiff's

brother was not receiving services at all from anyone.  Once Mr. Cotton's

brother realized that the Department was inadvertently paying someone for

services he was not being provided,he enrolled with another agency, causing the Plaintiff to lose one of his clients.

(36)

Mr. Cotton asserts that the Department acted to deny him the normal and required processes and accommodations when the Department denied him the adequate invoice submission guidance proscribed by Department policies and purposely misclassified to prevent him from operating his home help agency.  Mr. Cotton asserts that the Department was required to send a worker to meet him in person and provide him with sample documents, but refused to do so.   The Plaintiff also asserts that the Department used arbitrary invoice requirements to deny him the pay rate required to properly operate and fund his agency, and further used the consequences of his low pay rate to create another pretextual excuse to deny him the proper pay rate by using payroll documentation requirements while denying him the funds necessary for his agency to acquire payroll services.  Mr. Cotton asserts that Allison Allen and other MDHHS workers regularly used their positions to thwart his efforts towards operating his home help agency.

(37)

Mr.Cotton's intense battle for home aid assistance has not occurred in a vacuum.  Michigan families have long complained that it's difficult to find

caregivers for loved ones, in part, because of low wages.  Attorneys for six adults with severe disabilities accused the state of further cutting pay in 2015.  In early December 2023 it was reported that "A federal judge will consider a settlement in the case that would mean more pay for workers who care for people with intellectual and developmental disabilities in their homes. Under the terms of a federal lawsuit settlement, Michiganders in the publicly-funded Community Living Support program would receive an increase in state funding to $31 an hour.  The money would be used to pay for both caregivers, as well as expenses and transportation for outings." While the State has recognized that all Michiganders in the home care programs were suffering from a lack of pay, Mr. Cotton has been denied access to the low pay that the State conceded to being insufficient and inadequate.

(38)

**PLAINTIFF VIRECE BERRY SR.**

**Fourth Amendment Unlawful Seizure, Malicious Prosecution, Wrongful Imprisonment, Conspiracy to Violate Civil Rights, Malpractice, Due Process/Equal Protection Violation, Racial Discrimination, and Gross Negligence**

**U.S. Const. Amend. IV ; U.S. Const. Amend. XIV ; 42 U.S.C. § 1983 ; 42 U.S.C. § 1985(3) ; 42 U.S.C. § 2000a ; 42 U.S.C.  § 2000d ; M.C.L. § 600.2907 ; M.C.L. § 600.2912 ; M.C.L.  §  691.1755**

**Defendants Berrien County, State of Michigan, Benton Charter Township, Officer John Visel, Lt. Det. Michael DenDooven, Prosecuting Attorney Steve Pierangeli, Assistant Prosecutor Mark Sanford**

(39)

Plaintiffs reallge paragraphs 1-39.

(40)

Virece Berry, a dedicated father, was involved in a CPS case related to two of his teenage daughters.  The two teens were placed in the home with their father while CPS investigated their mother.   During the course of the investigation and working with Mr. Berry, CPS worker Brittany Wright asked Mr. Berry if there was anything else she could assist him with as a parent.  Mr. Berry confided in the MDHHS CPS worker that he had young sons who were in the custody of a drug addict who was oftentimes violent in their presence.   Mr. Berry sent photo evidence to CPS of Kylie Benson soliciting hard drugs and explained how she brought their children along on drug-infused escapades.

(41)

Mr. Berry sent more video evidence of Kylie Benson berating him with racial slurs, showing damaged property, and pictures of injuries he sustained from Kylie Benson's attacks.  Virece Berry asserts that his CPS worker was supporting his efforts to keep his sons safe up until she found out that their mother was Caucasian.  On February 12, 2021, Kylie Benson drove to Mr. Berry's place of employment so that he could see his children.  Mr. Berry asserts that Kylie Benson had been attempting to reconcile their romantic relationship but that he had not agreed to forgive her for previous incidents of infidelity.  Mr. Berry asserts that while he was speaking to his children, Kylie Benson received a phone call from the man she cheated on him with previously in their relationship.  At that point, Mr. Berry kissed his kids, and abruptly went back to work, angering Kylie Benson.  Kylie Benson began texting Mr. Berry and they argued over infidelity in their relationship.  Kylie threatened to keep the kids from Mr. Berry, who retorted that he had already begun a case with CPS.  Kylie called and responded that she has friends in local law enforcement, namely former Officer Andrew Collins, a family member through marriage, and that she was going to file a false police report against Mr. Berry in retaliation for his CPS efforts.

(42)

The next day, on February 13th, Kylie Benson called Benton Township Police and filed a false police report.  In Kylie Benson's fictional tale, she alleged that around 8;:00 p.m. Mr. Berry randomly took her cell phone and entered the front passenger seat of her car.  She alleged that Mr. Berry stated: "I want to see what type of ho you been" and began to go through her phone. She further alleged that he called and spoke with a male friend  of hers that he found in her text messages, and after a short conversation hung up.  She then stated, according to Defendant Visel's police report, that Mr. Berry spat in her face and choked her also.  Officer Visel asked Kylie Benson if Virece Berry restricted her breathing and she answered in the affirmative.  Kylie Benson did not stop there, she continued to fabricate crimes to frame Mr. Berry with.  She further alleged that Virece Berry, the father of her children, began rummaging through her glovebox, center console, and purse; that he demanded she go to an ATM and withdraw and give him three hundred dollars, and when she refused, that he stole twenty dollars from her purse, the children's social security cards, and the sim card from her cell phone, preventing her from calling 911, she claimed.  (See, Exhibit J, Virece Berry - Def. Visel Police Report).

(43)

On February 16th, 2021, without investigating any of Kylie Benson's claims, Officer John Visel stated: "at this time I am currently seeking criminal charges for Domestic Violence/Strangulation, Larceny from a Person, and Interfering with a Telecommunications device.  The status of this case is CLOSED." (See, Exhibit J, Virece Berry - Def. Visel Police Report).  The next day though, the police report details that Officer Visel was contacted by Plaintiff Virece Berry who refuted Kylie Benson's false allegations with an alibi and exculpatory evidence to prove it.  Mr. Berry asserted that he was at work, and showed text message evidence proving she brought the kids to his job, and that he did not and would not attack her at all, but especially not while actively working at his place of employment.   According to the police report, Mr. Berry asserted clearly that he did not assault or touch Kylie Benson, that her allegations were completely false, and provided text messages and videos to support his claims and version of that night's events, in particular, being at work and not at home, unlike Kylie Benson's uncorroborated story.   Officer John Visel's police report also details that there was no physical evidence to corroborate Kylie Benson's story of strangulation.   John Visel states that Mr. Berry informed him that Kylie Benson was the one who notified him about her false police report and that it was in response to a child custody arbitration hearing they were supposed to

attend the day after she made the false claims.   John Visel noted in his conversation with the Plaintiff that Mr. Berry was able to show him text message evidence that Kylie Benson asked him if he wanted to see his children and offered to bring them to his job, which contradicted the story she told him the day before alleging that Mr. Berry asked her to bring them to his home residence and corroborated Mr. Berry's alibi.  Despite that fact, John Visel concluded again that the case was closed.  (See, Exhibit J, Virece Berry - Def. Visel Police Report).  Had Officer Visel not been operating pursuant to racial animus, he would have investigated Kylie Benson for filing a false police report, as he had clear and undisputed evidence of her lies.

(44)

On February 26th, 2021, Detective Michael DenDooven added a supplement to the police report that noted CPS worker Brittany Wright sent video and picture evidence of the alleged incident.  Detective DenDooven did not detail if the video and pictures were evidence of Kylie Benson being assaulted or Virece Berry being assaulted.  Virece Berry, in the previous weeks and days, had sent ample video and picture evidence of injuries he sustained from attacks by Kylie Benson to CPS.  The evidence that the Plaintiff sent to CPS, displaying Kylie Benson's violent nature, drug abuse,

and dangerous parenting, was instead forwarded to Benton Township police department for the sole purpose of being used as evidence to support Kylie Benson's false allegations, despite being aware that they received the evidence as proof of allegations against Kylie Benson.  While attempting to attend a CPS hearing and sign child support paperwork at MDHHS, Mr. Berry was arrested on the domestic violence warrant initiated by John Visel and Detective DenDooven.  In his conversations with his CPS case manager after making bail, she alleged that according to her investigation, there was no record of him refuting Kylie's false claims with the police and that she had to "follow" her investigation, which despite being opened based on Mr. Berry's concerns and evidence, had now turned against him once his co-parent was revealed to be Caucasian. Not only were Kylie Benson's allegations unsubstantiated, they were quickly refuted with evidence. The initiating officers knew that there was no evidence to support the allegations and clear evidence to refute them.  Not only did Mr. Berry directly contact the police and quickly disprove Kylie Benson's false allegations with an ironclad alibi and exculpatory evidence, he was further framed by CPS when they knowingly converted his child protective custody evidence against Kylie Benson into fabricated evidence to support her false police report.

(45)

The Plaintiff was assigned a public defender and ordered on house arrest as the case proceeded.  At a preliminary hearing, Mr. Berry informed his first public defender to prepare for trial because the allegations were false and he intended to prove it.  Mr. Berry asserts that his public defender replied: "Haven't you heard about me? I'm Benton Harbor's worst nightmare", essentially being sarcastic and facetious  about the poor reputation of public defenders in the community, largely owed to decades of Berrien County's underfunding.  Upon hearing the quip from counsel, Mr. Berry asked for a new attorney because he felt his initial counsel had just expressed that she did not want to fight vigorously on his behalf.  The Berrien County Public Defender's Office assigned Attorney Kevin Mackin to proceed with the case.

(46)

Mr. Berry was initially ordered to house arrest by Judge Pasula, who after doing so, assigned the case to another judge.  As the house arrest fees grew more taxing, Mr. Berry began to plead for relief via a reassessment of his bail conditions.  The new sitting judge repeatedly responded that he could not overrule Judge Pasula's initial ruling, rendering the Plaintiff stuck.  As the situation grew more dire, Mr. Berry confided in Attorney Mackin that he was having a hard time paying his rent because of the weekly tether house arrest payments.  Attorney Mackin advised the Plaintiff to stop paying his

ankle tether fees and to catch up on his rent.  Trusting his counsel, Mr. Berry did so, reasoning he could not effectively remain on "house" arrest without first securing housing.  The Berrien County Courthouse sent the notice for the Plaintiffs next court hearing to the wrong address and his counsel failed to notify him or inform him of the date.  When Mr. Berry appeared at the next court date he did get a notice for, he was arrested for contempt of court.  Furthermore, his back house arrest fees were added to his bail.  Mr. Berry asserts that it was during this period of incarceration and financial vulnerability that his public defender pressed and pushed the hardest to secure his acceptance of a plea deal.  Determined not to be broken, Mr.Berry raised funds through his family, paid his fees, and was again released on bail.

(47)

Upon release, Mr. Berry refused to accept a plea bargain and continued pushing his public defender to build his defense.  After several conversations and repeatedly refusing to accept a plea bargain or any accountability for the allegations lodged against him, Mr. Berry asserts that he was banned from the Berrien County Public Defender's office solely for demanding that he actually be defended.  Mr. Berry struggled with house arrest fees for over a year.  During that time period, Kylie Benson admitted to her false allegations and apologized for making her injurious, fabricated police report.  Still

though, despite her retractions and the ample exculpatory evidence contradicting her claims from the onset, the Berrien County Prosecutor's office refused to drop all of the charges until close to the 2022 trial date. With no evidence of an altercation or any physical injuries, and Kylie Benson retracting her allegations all together, Assistant Prosecutor Mark Sanford dropped the first charge, "Assault with Intent to do Grave Bodily Harm" on March 18th, 2021, but continued to pursue the other felony charges of "Larceny from a Person", "Domestic Violence", and "Suppression in the Fourth Degree", all while knowing there was no chance of winning the case before a reasonable and unbiased jury. Nevertheless, Mr. Berry continued to face several decades in prison if he accepted a plea conviction.

(48)

On February 16th, 2022, Assistant Prosecutor Mark Sanford filed a motion of nolle prosequi, seeking dismissal of the remaining three charges. The motion was not ruled on for another two months, finally ending Virece Berry's house arrest and bail conditions on April 16th, 2022. For over a year, Mr. Berry was seized, had his liberties restricted, and paid over forty thousands dollars in fines and fees that was never returned, simply because law enforcement and officers of the Berrien County Courts  acted in

accordance with Berrien County's customs of racial animus and using governmental powers as a tool of racist oppression.

(49)

## PLAINTIFF ANISHA BIRD

### Fourth Amendment Unlawful Seizure, Wrongful Imprisonment, Due Process/Equal Protection Violation, and Gross Negligence

### U.S. Const. Amend. IV ; U.S. Const. Amend. XIV ; 42 U.S.C. § 1983 ; 42

### U.S.C. § 2000a ; 42 U.S.C.  § 2000d ; Title VI of the Civil Rights Act of

### 1964

### Defendant Berrien County

(50)

Plaintiffs reallege paragraphs 1-50.

(51)

Anisha Bird and her child's father, two young adults, attended a get together at a friend's hotel room where a group of then under twenty-one year old engaged in alcohol consumption.  The group of drunken youths grew loud and rambunctious, leading to hotel management to order them out of the building.  Having lost patience with the patrons, management called the police while Ms. Bird and her significant other waited for their rides to arrive.  The police arrived to find Ms. Bird and her boyfriend arguing with

each other.  The police swiftly arrested the two and Ms. Bird was booked into the Berrien County Jail.

(52)

Upon making bail,  Ms. Bird was not informed of her next court date and was told that she would receive notice through the mail at the address she provided.  Ms. Bird did not receive notice of her next court date despite repeatedly calling to check and see if one had been issued.  At some point Ms. Bird was issued a second court hearing date and provided notice to appear before the Berrien County Court.  When Ms. Bird appeared, she was arrested for contempt of court because she failed to appear at a Court hearing for which she never received a notice and was unaware of.  Ms. Bird was forced to forfeit her bail and serve thirty days in the Berrien County Jail as a consequence.

(53)

**PLAINTIFFS QUANTILLA ROBERTSON, NEXT FRIEND FOR R.R.**

**Eighth Amendment Cruel & Unusual Punishment, Fourteenth Amendment Due Process/Equal Protection Violation, Racial Discrimination, Disparate Treatment, and Gross Negligence**

**U.S. Const. Amend. IV ; U.S. Const. Amend. XIV ; 42 U.S.C. § 1983  ;**

**42 U.S.C. § 2000a ; 42 U.S.C.  § 2000d ; Title VI of the Civil Rights Act**

**of 1964**

### Defendants Berrien County, Paul Bailey

(54)

Plaintiffs reallege paragraphs 1-54.

(55)

In August 2020, youth R.R. was placed on probation for resulting from behavioral problems and began Intensive Probation Services and Functional Family Therapy.  In February 2021, R.R. was placed on a tether because of behavioral concerns at home and noncompliance with curfew.   After absconding from tether, respondent was detained at the Berrien County Juvenile Detention Center from September 9, 2021 until September 24, 2021.  On the later date, he was released with conditions: (1) again placed on tether, (2) escalated from Intensive Probation Services to Intensive Community Treatment Program, and (3) placed in Parenting with Love and Limits. His team consisted of a therapist, a case manager, tether supervision by reintegration officers, a substance-abuse counselor, and virtual schooling, specifically built to provide him with programming because of his high risk to reoffend." *People v. Robertson (In re Robertson)*, No. 360538, at *3-4

(Mich. Ct. App. Apr. 20, 2023) (unpublished).   At no point was R.R. evaluated for mental illness or mental disabilities in relation to his behavioral issues.

(56)

R.R. was returned to his mother after being ordered to more intensive programming.  While playing basketball outside with friends, R.R. pulled a gun and shot a youth in the back of the head on October 15th, 2021.  R.R. who was fourteen at the time of the killing, was held in solitary confinement in Berrien County's adult jail for two years leading up to his conviction. While most child killers in the State of Michigan are held in juvenile detention areas or separate centers that offer services, R.R. was isolated in Berrien County Jail's adult "hole" or "solitary confinement" for approximately a year, further exacerbating his mental health issues.  R.R. was tried as an adult, convicted of murder, and awaits sentencing, possibly to life without parole, after killing at fourteen years old and approximately a year in the hole.  R.R. reports that when he was initially booked into the juvenile detention area of the Berrien County jail, he informed guards administrators that the victims family member was present and would likely seek retribution against him.  His safety concerns were ignored.  Two fights

eventually ensued, one known to jail guards and the other unnoticed.  R.R. was not charged for the incidents, but was instead moved to the adult holding area.  In the adult detention area, then fourteen year old R.R. was exposed to "Leoni David", an adult who was being held on criminal sexual conduct charges.  R.R. attest that Mr. David sexually assaulted him through a verbal remark, prompting him to choke him.  R.R. was initially charged with strangulation, but the charge was dropped, and R.R. was subsequently placed in the solitary confinement "hole."  According to R.R., he was put in a small, uncleaned cell covered with blood, feces, and urine on the walls and floors. R.R. asserts that he was tortured with regular urination flowing under his cell door and berated with the racial epithet "nigger" habitually by someone on the otherside of his cell door.  R.R. asserts that Sergeant Jacob Will and jail administrator Calena Herbert conspired to keep him in the hole when each repeatedly directed him to speak to and seek the others assistance in regards to his release from the hole. "J-Will would send me to Herbert and Herbert would send me to J-Will", the Plaintiff asserts.  The victim was released back into the general population only when disability rights organizations began to pressure for his release and scrutinize his being placed there.

(57)

R.R. asserts that his psychiatric counselor showed up sparingly, sporadically, and was inadequate, as she would ask if he wanted to kill himself and that only.  R.R. asserts that the prosecuting attorney is pursuing a sentence of life without parole and feels that his public defender is intentionally failing to defend him and or cooperating with the prosecution.

(58)

The Berrien County Jail, under former Sheriff Leonard Paul Bailey, has earned and maintained a very dark, eerie reputation.  In the midst of consistent rumors of inmate abuses and health concerns, a young Black man, Martell Hadley, was found hanging in his cell in February of 2016, the same year a gunman killed multiple sheriffs in a Berrien County courtroom.  Last year there were four deaths in a six month span alone.  The treatment that R.R. received in the Berrien County jail is barbaric and starkly different from teenage Caucasian inmates who commit just as heinous, if not worse crimes.  Dakota Eliason, who was also held and prosecuted in Berrien County in 2010, was convicted of murdering his parents at fourteen years old.  Throughout his criminal prosecution process, he was not unreasonably exposed to danger by being housed with adults charged with criminal sexual conduct, nor was he held in a feces-filled "hole" while he awaited trial.  R.R.

spent twelve long months in solitary confinement and was not moved back to juvenile detention until he was sixteen years old. in an poorly maintained and bacteria ridden jail, constituting cruel and unusual punishment.

(59)

## PLAINTIFFS IESHIA BLACKWELL, REPRESENTATIVE FOR THE ESTATE OF CARL COLEMAN

**First Amendment Suppression of Free Speech, Fourth Amendment Unlawful Search & Seizure, Due Process/Equal Protection Violation, Conspiracy to Violate Civil Rights, Racial Discrimination, Disparate Treatment, and Gross Negligence**

**U.S. Const. Amend. IV ; U.S. Const. Amend. XIV ; 42 U.S.C. § 1983  ; 42 U.S.C. § 1985(3) ; 42 U.S.C. § 2000a ; 42 U.S.C.  § 2000d ; Title VI of the Civil Rights Act of 1964**

**Defendants: Berrien County, City of Benton Harbor, Daniel E. McGinnis**

(60)

Plaintiffs reallage paragraphs 1-60.

(61)

Plaintiff sued Berrien County Jail, Benton Harbor Public Safety Director Daniel McGinnis, Officer Gee, and former Officer Rose for unlawful seizure through violations of due process.  After her long history of being abused and harassed by local police officers, including two wrongful imprisonments in Berrien County Jail, the Plaintiff developed anxiety issues related to police contact.  It was within this context that Officer Gee began repeatedly making unnecessary contact with the Plaintiff in relation to her then teenage son.  Officer Gee accused Carl Coleman of lighting fireworks in the school when he came to the Plaintiff's house to investigate the issue and pressure her to support his investigation.  The Plaintiff responded that her son was not living with her and that she could not help him or his investigation. Within the next month, Officer Gee appeared at her door again.

(62)

In the Plaintiffs first lawsuit she detailed: "On March 22nd, 2019, the Defendant, Officer Reginald Gee, knocked on the Plaintiff's door and asked her if she knew about trash across the street on Brunson Ave. The Plaintiff informed Officer Gee that she had no knowledge about trash across the street. Officer Gee then stated that there was a piece of mail with the Plaintiff's child's name on it. The Plaintiff responded that maybe the wind

blew it out of the trash and across the street because it had been cold and windy recently. The Plaintiff told Officer Gee that she would retrieve the piece of mail. Ms. Blackwell was scared by the officer's unwarranted presence at her home and called her mother. The Plaintiff's mother came, directed the plaintiff to stay in her room, and proceeded to speak with Officer Gee." *Blackwell v. Gee, et al.* Case 1:21-cv-01023 ECF No. 1, Pg. 10. Officer Gee "attested" that he offered the citation to Mr. Blackwell, but she refused to take it. Ms. Blackwell asserted that she called her mother who spoke with Officer Gee and that he did not leave her with a citation. Despite this fact, the Court accepted the Defendants "attestations" as true and disregarded the assertions of the Plaintiff, despite having a legal obligation to honor them as true. Ignoring the material factual dispute surrounding the actual issuing of the citation and favoring the Defendant's dispositive motion pre-textual story, the Court concluded: "The evidence in this record indicates that Blackwell was afforded the process she was due. Officer Gee attests that Blackwell was not deprived of notice but refused to take the citation he had written for littering/dumping in a public place (Gee Aff., ECF No. 48-1 at PageID.654)." *Blackwell v. Gee, et al.* (1:21-cv-01023-JMB-SJB, ECF No. 49, Pg. 12). In its conclusion, the Court ignored the fact that Officer Gee did not have any grounds outside of

51

retribution for issuing a "littering/dumping" citation.   In his own words, Officer Gee also attested that he issued the citation because he saw a piece of mail in the road, which is not probable cause for littering or dumping under the law.

(63)

During the time that the case was before the Court and after it was dismissed, the Plaintiff asserts that she was subjected to intimidation and harassment by Daniel McGinnis and his cohorts.   In the course of her litigation against the City of Benton Harbor and its police officers, the Plaintiff revealed that she suffered from anxiety related to police contact. After that revelation, Daniel McGinnis and other Benton Harbor Officers came to her place of employment to antagonize her on several occasions. Ironically, the Benton Harbor community has an abundance of car auto parts stores, at least three on the same street as the one the Plaintiff works at. Despite being in litigation, being well aware of the Plaintiff's mental health issues, and having several options to avoid contact, the Defendant and his officers repeatedly came to the specific auto parts store that employs the Plaintiff.   One such cohort, officer Michael Clark, and others specifically sought out the Plaintiff for assistance and forced contact between them,

further intensifying the Plaintiffs fears of retribution and inflaming her anxiety and mental health issues related to police contact.  Benton Harbor Public Safety Officers set outside of her home and watched her residence for long periods.

(64)

According to Ms. Blackwell, Benton Harbor Public Safety Officers also began to harass the Plaintiff's son, Carl Coleman as well.  In one such incident, on October 19th, 2022, without any probable cause, the Benton Harbor Public Safety officers sought after and detained Carl Coleman and accused him of assaulting a woman and stealing her car.  After being taken to the scene and shown to the victim, she corroborated that he was not the suspect and that they did not have any similar features or characteristics. After being detained for some time longer, Mr. Coleman was eventually released.  Mr. Coleman was allegedly sitting in the passenger seat of what was believed to be a stolen car when he was detained for questioning and placed in a one person line-up before the victim.  The driver of the allegedly stolen vehicle was not taken for questioning or placed before the victim for identification.  Carl Coleman garnered infamy among local law enforcement

for allegedly being a gang member and an aspiring rapper with a dangerous collection of, or direct access to lethal weapons. (See Exhibit S).

(65)

Mr. Coleman flashed semi-automatic weapons and handguns in his social media posts and reposted his personal rap lyrics about shooting guns. Artistic trends have bred many artists whose entire entertainment personas are akin to some form of an action hero or villain like "Rambo" or Batman's nemesis "the Joker."  Carl Coleman Jr., who published himself as "607 Nukk" online, like many Americans loved guns, music, and was a popular person in his community.    Almost a year after being detained without probable cause by BHPS officers, Carl Coleman was tragically killed.  His mother alleges that he was harassed by local police until the day he died.  On the day after his death, Berrien County Sheriff's Officers raided his Benton Township apartment.  They told family members on the scene that they were seeking guns and were directed to the home by the Benton Harbor Public Safety Department.  According to the family, no firearms were confiscated, but sheriff's did take multiple cell phones from the residence on September 11th, 2022.   Warrant tabulations reveal that a handful of bullets were recovered along with a gun case, but also confirms that no weapons were

found.  Warrant information details that Mr. Coleman was being investigated for potential involvement in a previous homicide in the City of Benton Harbor, MI.  Plaintiff asserts that she was not aware of the Defendants' investigation of her son but is aware that they previously accused him of serious crimes without probable cause or a reason in the past and their allegations were proven false.  The Plaintiff further asserts that she has requested the return of the cell phones, but that the Berrien County Sheriff's office has been unresponsive and uncooperative.  There are no cell phones listed on the warrant tabulation and the incident report bears no record of their existence.  Ms. Blackwell asserts that her son was not under investigation for murder or for being in possession of a murder weapon.  She asserts that he was never sought for questioning related shootings, and that had he been involved in a murder in any way, he would have been arrested by authorities before his death.  At the time of his death, Carl Coleman Jr. had cell phones, jewelry, and other personal belongings on and with him. The Plaintiff has sought these materials from the City of Benton Harbor's public safety department for over a year.  She last requested their safe return from a BHPS Detective on September 22nd, 2023, but has yet to receive a reply.  Plaintiff asserts that the explanation for the raid on her son's home the day after his death is a fictional cover-story and that the raid was directed

with retribution and vindictive motives.  Furthermore, she asserts that the absence of cell phones on the tabulation is an indicator of the warrant's falsification.

(66)

Four months after Mr. Coleman's death, in January of 2023, the Plaintiff held a balloon release in memory of her son and to celebrate his first posthumous birthday.  Michigan State Police officers sat and watched the event, and when the family and friends paraded away,  Michigan State trooper Gary Fleming Jr. pulled Carl Coleman's best friend over.  The officer did not state any reason for the seizure, but noted in his report that upon questioning the driver, he noticed that the passenger, the driver's girlfriend, had a warrant out for her arrest.  Like most Americans, when Black Americans in Berrien County need police assistance they call for it.  But when Black residents in Berrien County non-violently congregate around weddings, the loss of loved ones or host personal celebrations in congregation, they draw the attention and ire of local police officers simply for their peaceful assembly.   This custom of racial animus was the foundation of Benton Harbor's 2003 riots.  After Michigan State troopers initiated and acted out a high speed chase in the residential community, they,

according to several witnesses, bumped the back tire of a fleeing motorists, sending his motorcycle into an abandoned building and causing his death. The next day community members gathered at the site to mourn his loss and were forcibly dispersed by Benton Harbor Police officers, causing two days of riots and a state of emergency in the city and county.  As the community angrily anticipated, the MSP's investigation themselves found no wrong doing on their part.  Since that time, the coalition of Benton Harbor Police officers, Benton Township Police officers, Berrien County Sheriff's, and Michigan State troopers have continued to wrongfully injure innocent citizens by subverting their constitutional rights.  When citizens like Ieshia Blackwell resist or challenge these violations by filing grievances, complaints, or lawsuits, the State agents react vindictively with retaliation and enjoy the full protection and support of their fellow official colleagues in Berrien County, thereby converting public institutions of justice into tools of racial oppression and personal retribution.

(67)

## PLAINTIFF TEMESIA DAVIS

**Due Process/Equal Protection Violation, Conspiracy to Violate Civil Rights, Intentional Discrimination, Malpractice, and Gross Negligence**

**U.S. Const. Amend. XIV ; 42 U.S.C. § 1983, 42 U.S.C. § 1985(3)**

**Defendants: Berrien County, Taylor Koch, Caleb Grimes**

(68)

Plaintiffs reassert paragraphs 1-68.

(69)

In 2021 Temesia Davis was dating a man who was being prosecuted by Assistant Berrien County Prosecutor Taylor Koch.  During the course of Attorney Koch's prosecution, she solicited Temesia Davis to testify against her then boyfriend.  Initially Ms. Davis agreed, but ultimately changed her mind and refused to testify, infuriating Taylor Koch, who threatened the Plaintiff and warned that she would regret it.

(70)

The next year, in 2022, the Plaintiff was arrested for possession of a firearm. The Plaintiff's weapon was registered.  Being as such, she hired Caleb Grimes, a private Western Michigan criminal defense attorney. Attorney Grimes pressured the Plaintiff to take a plea deal, to which she was initially resistant.  During the course of her defense, the Plaintiff underwent a serious medical surgery and was heavily medicated prior to attending a court hearing and conceding to her attorney's pressures to accept a plea.  Three

days later, when the Plaintiff came down off of her medication and realized what she had done, she contacted her attorney and requested he submit an emergency motion to have her plea withdrawn.  Ms. Davis asserted that she was heavily medicated and was not in a position to make a life changing decision of that nature in that condition and would like to continue with her original defense strategy of pleading not guilty.

(71)

Attorney Grimes did not submit the motion until six weeks later, which was noted by Judge Pasula when she denied the motion in April of 2023.  At the motion to withdraw hearing, Ms. Davis and Attorney Grimes appeared virtually over Zoom.  During the course of the hearing, the Plaintiff was visibly on her cell phone; recognizing it, her attorney texted her to put her phone down and did not direct her to do so out loud verbally.  According to Ms. Davis, when Judge Pasula came back from a recess, she specifically spoke about Attorney Grimes directing the Plaintiff to put her phone down. The Plaintiff asserts that she got this direction over text message and there was no way for the judge to know about it but for her Attorney to communicate with Judge Pasula about her case without her knowledge.

(72)

The Plaintiff was working as a registered nurse at the time charges were initiated against her.  After Judge Pasula denied her motion to withdraw her plea citing timeliness and not prejudicial effect to the Prosecutor or Justice not requiring so, Prosecuting Attorney Taylor Koch personally called the Plaintiffs place of employment and informed her superiors that she had just been convicted of a felony, causing her to fired immediately.  Attorney Koch did not give the Plaintiff an opportunity to appeal Judge Pasula's motion ruling or her conviction before using her public office as a weapon of retribution.  Attorney Taylor Koch intentionally discriminated against the Plaintiff when she personally called her place of employment to get her fired before the judicial process finished playing out, an act she does not normally pursue against similarly situated defendants.  Plaintiff asserts that Taylor Koch has not immediately called the employers of any of her professionally licensed Caucasian Defendants whom she prosecuted on the same day as their convictions and before giving them an opportunity to appeal.

(73)

## PLAINTIFF CHARASE DORSEY

**Fourth Amendment Unlawful Search & Seizure, Due Process/Equal Protection Violation, Conspiracy to Violate Civil Rights, Racial Discrimination, Malicious Prosecution, and Gross Negligence**

**U.S. Const. Amend. IV ; U.S. Const. Amend. XIV ; 42 U.S.C. § 1983  ;**

**42 U.S.C. § 1985(3) ; 42 U.S.C. § 2000a ; 42 U.S.C.  § 2000d ; Title VI of**

**the Civil Rights Act of 1964**

**Defendants: Berrien County, Paul Bailey, Det. William Ashley, Det.**

**Jeremiah Gauthier**

(74)

Plaintiffs reallage paragraphs 1-74.

(75)

According to Michigan Depart of State Police Incident Report No
"SWE-0000016-22", on January 19th, 2022, Michigan State Police
detectives Jeremiah Gauthier and William Ashley claimed to have pulled
twenty copies of U.S. Currency on printer paper and a prescription receipt
for tylenol with the Plaintiff's name on it in her trash can.  According to the
MSP incident report, the Defendants confiscated the counterfeit money
evidence and the prescription receipt and used it to get a search warrant for
the home at 1689 Downing Avenue, Township of Benton, County of Berrien,
the same day.  On January 20th of 2022 at 8:15 a.m. in the morning, the
Plaintiff, Mrs. Charase Dorsey, was in the restroom preparing to take a

shower when she heard loud and intense banging on her door. Startled and frightened, the Plaintiff put back on her nightgown and headed towards the front door to see what was going on. As Mrs. Dorsey, an unassuming grandmother, walked towards the door, it was rammed open, and masked, heavily armed gunmen poured into her home.

(76)

Fearing for her life, the Plaintiff complied with the demands of gunmen and listened as they explained they were police officers conducting a raid. The Plaintiff responded that they must have the wrong home and that she did not understand what was going on. On the ground in shock, the Plaintiff was pulled to her feet and forced out of her home at gunpoint. As the Plaintiff was being removed from her home, she continuously asked who and what the officers were looking for and stated repeatedly that they had the "wrong house." While the Plaintiff was handcuffed, detained, and compliant, officers still pointed their loaded, deadly weapons at her with their fingers on their triggers.  In addition to unnecessarily being held at gunpoint, Mrs. Dorsey was left in the snow with nothing on but a nightgown while her limbs were cuffed and restricted, preventing her from retaining her own body heat in the early morning, winter cold of Southwest Michigan.   Finally, after

approximately thirty minutes in the cold, the Defendants brought the plaintiff back into her home and set her down, handcuffed, at her dining room table.  Still sobbing and crying, the Plaintiff again asked the officers who and what they were looking for, and why they had violently invaded her home.  As the Plaintiff shivered at her dining room table, the officers stated that they would explain themselves "in a minute."  The Plaintiff requested to see a warrant, but officers ignored her and continued to destroy her belongings in her face, ripping down her home security system, breaking her solar lights, and tearing curtain rods, antagonizing the Plaintiff.

(77)

Once the Defendants efficiently ransacked the Plaintiffs home, leaving nothing in its original place and destroying several of the Plaintiff's miscellaneous belongings, Defendant Detective Ashley detailed how the Plaintiff had been accused of counterfeiting money, that she had been "under surveillance", and that she would be questioned at a later date.  Detective William Ashley claimed to have found a digital scale with powder residue on it and Detective Jeremiah Gauthier claimed to have found an "unknown" brown substance "in plastic" inside of the Plaintiff's bible.  The Plaintiffs personal cell phone was confiscated by the Defendants as potential "office

equipment" evidence for approximately four months before it was returned by Detective Ashley. The Plaintiff has had no other contact from the Michigan State Police and retrieved her phone through the efforts of her attorney.  The Plaintiff asserts that there is no possible way that she was surveilled and believed to be counterfeiting money.  In the course of Counsel's investigation, the supervisor for the Plaintiff's trash route confirmed that her garbage man had not spoken to him or anyone at their office about suspecting a resident of counterfeiting money, but that it was not the first time local police officers named phantom garbage men in their alleged investigations.

(78)

Less than forty-eight hours after the raid, the Plaintiff's aunt called the Berrien County Sheriff's department to speak with the community's elected law enforcement official, Sheriff L. Paul Bailey, in regards to the mistaken raid on her niece's home. When asked what probable cause the Berrien County's Sheriff Department, in coalition with the Michigan State Police, would have to suspect her niece of counterfeiting money, the Sheriff responded that the Plaintiff's garbage man had turned in counterfeit money and accused the Plaintiff of creating it; furthermore, the Sheriff went on to

state that the Plaintiff was also suspected of selling drugs out of her home. The warrant left with the Plaintiff does not list drugs or narcotics of any sort as being affiliated with the items expected to be in the home.  Nevertheless, Defendant Sheriff Bailey stated to a relative of the plaintiff and member of the community that her garbage man turned her in for counterfeiting money and that she has been under investigation for selling narcotics.  All of this sounded preposterous to the Plaintiff and her family, as she could never have been confused to be counterfeiting money or selling drugs if she had actually been under surveillance at any time prior to the raid on her home.

(79)

Shortly after the conversation with the Sheriff, his statements were relayed back to the Plaintiff, causing her to live in fear and apprehension of unknown nefarious forces spreading dangerous false allegations. Since having her home violently raided, ransacked, and her dignity, reputation, and self-respect trampled on by the Defendants, the Plaintiff has suffered emotional anguish, post traumatic stress, anxiety attacks, nightmares, loss of sleep, and loss of reputation.   Mrs. Dorsey, a working grandmother, continues to live without any information for why her home was invaded,

and ransacked, or why she was vindictively tortured and humiliated by being detained outside at gunpoint while only wearing her bathrobe.

(80)

The Plaintiff's federal complaint was dismissed without prejudice for failure to state a claim.   While the case was before the Court, the Defendants, Detective William Ashley and Officer Jeremiah Gauthier initiated a criminal complaint based on the collection of items from their raid, namely shotgun shells found in the home.  Despite claiming to have found hard evidence of counterfeiting in her trash and a brown substance wrapped in powder in her Bible located next to a digital scale with powder residue, no counterfeiting or drug charges were initiated against the Plaintiff.  The Plaintiff asserts that the Michigan State Police Detectives and Berrien County Sheriff's Deputy Shawn Yech lied about the presence of drugs in her home and confiscating counterfeit money out of her trash can, as evidenced by the overzealous Berrien County Prosecutor's office refusing to pursue charges on those basis. The warrant report notes that the Plaintiff stated that she was not aware or responsible for illegal items found in the home, and that any illegal items they confiscated from her home had to be left there by family members without her knowledge.  The Berrien County Prosecutor's office and Steven

Pierangeli pursued ammunition in possession of felon charges while knowing that Mrs Dorsey's felony retail fraud convictions was far more than three years old, the time frame proximity needed for the ammunition possession statute.  The Felon in Possession of Ammunition statute clearly states within three years of a felony offense.  Mrs. Dorsey's retail fraud charge was filed in October of 1994, and this was known at the time of charging by the Berrien County Prosecuting Office, who dropped its sole charge stemming from the fabricated raid the day of trial.  As she initially believed before being confused by an investigative raid, there were no illegal items or substances in her home.  The digital scale was left there by her son and only contained regular dust from non-use.  There was no substance in her bible and none was ever produced by the investigating officers nor the Berrien County's Prosecutor's Office, despite the allegations of Paul Bailey, William Ashely, Jeremiah Gauthier, and Shawn Yech.

(81)

While facing the pressure and stress of actually being framed by the police powers of the State, the Plaintiff suffered a heart attack.  After initiating serious charges against the Plaintiff, the Berrien County Prosecutor's office repeatedly lowered the charges and pressured her to take a plea, even after

her daughter provided purchase receipts for the shotgun shells found in the raid and her personal shotgun, and the Plaintiff provided medical records and prescriptions.   Despite lacking any factual grounds or evidence to support their charges, the Berrien County Prosecutor's office repeatedly used the powers of the State to pressure an innocent citizen into convicting herself. The stress and anxiety caused by the Berrien County's Prosecutor office's trumped up charges and fraudulent prosecution pursuit caused the plaintiff to suffer a cardiac arrest.   Her health's deterioration is directly related to the stress and anxieties brought on by the actual possibility of losing at trial and being convicted as a result.   Mrs. Dorsey's son was convicted of narcotics trafficking or related charges in July of 2021.   The Plaintiff believes the raid could possibly be retribution related to her son, but otherwise has no explanation for why MSP and Berrien County officers would lie and say that they investigated her, surveilled her home, found counterfeit money on her property, or that she was involved in narcotics trafficking.   The Plaintiff maintains that a true investigation and surveillance of her would have shown no such activities or possession.    As a result of the malicious and unwarranted search, seizure, and prosecution lodged against her, Mrs. Dorsey lost her professional child care license, access to MDHHS

government programs, and was denied job opportunities as the charges filed

without probable cause, set pending against her.

(82)

## PLAINTIFF JASMINE MCCOY

**Fourth Amendment Unreasonable Seizure, Eighth Amendment Cruel & Unusual Punishment, Due Process/Equal Protection Violation, Racial Discrimination, Conspiracy to Violate Civil Rights, Assault, Battery, Intentional Infliction of Emotional Distress, and Gross Negligence**

**U.S. Const. Amend. IV ; U.S. Const. Amend. VIII ; U.S. Const. Amend. XIV ; 42 U.S.C. § 1983 ; 42 U.S.C. § 1985(3) ; 42 U.S.C. § 2000a ; 42 U.S.C. § 2000d ; Title VI of the Civil Rights Act of 1964**

**Defendants Berrien County, Paul Bailey, Unknown Defendants**

(83)

Plaintiffs reallege paragraphs 1-83.

(84)

Jasmine McCoy, a young Benton Harbor, MI resident, has battled with mental health issues for most of her life.  In April of 2023, she was living across the street from a local park and in the company of her then eighteen year old niece.  The Plaintiff states that she heard a random scream for help and rushed to her front door.  While standing in her doorway, she saw her niece being attacked by a group of girls.  The niece, weighing less than a

hundred pounds, was being viciously attacked by several larger individuals when the Plaintiff rushed to her defense.  One of the attackers lost their makeshift weapon, a hammer, and the Plaintiff picked it up and threatened the attackers with it and swung it wildly.  Ms. McCoy was ultimately arrested and charged with attempted murder among other serious felonies, but was eventually released after making bail.

(85)

While being present in Berrien County Jail in April of 2023, the Plaintiff alleges that deputy guards refused to give medical attention, a sleeping mat, or respond to any of the requests of an inmate who ultimately died while being ignored in custody.  Throughout the rest of 2023, Ms. McCoy continued to be arrested and detained in Berrien County jail on probation and bond violations.  Over that course of time, three more individuals died while being detained in Berrien County Jail.  The Plaintiff details that inmates are regularly abused and taken advantage of by deputies within the facility.  While being present in Berrien County Jail in 2023, the Plaintiff heard deputies Jonathan Bowman and Jacob Will bragging about having sex with female inmates and how they participated in an on-going custom of deputies taking female inmates into areas of the jail without cameras and

having sex with them in exchange for providing commissary materials to the post-raped female inmates.   The Plaintiff alleges that hearing these conversations further intensified her trauma, anxieties, and fears of continuing to be abused and injured in their custody.

(86)

In October of 2023, the Plaintiff was again being held in Berrien County Jail after several recent stays.  Jasmine McCoy states that in an attempt to get the guards attention, she yelled that she was going to kill herself.  Despite being aware of her mental health issues and personality due to her recent and frequent stays, a group of co-ed deputy guards, six in total, vindictively retaliated for irritating behavior by entering her cell and viciously attacking her.   The Plaintiff states that despite not resisting, the deputies facetiously accused her of resisting as a pretext while beating her with their fist and feet, causing her head to bang against the jail's concrete floors, before stripping off her clothing and leaving her naked and injured.  After some time, she was eventually placed in a restrictive suit and starved in solitary confinement for three days.  The Plaintiff states that in addition to being denied food and water for three days, she was also denied medical attention after the beating as well as her mental health medications.   The Plaintiff alleges that her

brother, Shabrea McClinton, was also being held in the Berrien County jail at the same time as her attack, and was also viciously beaten by Berrien County deputies, in what she believes was a coordinated attack on the two of them.  Furthermore, deputies continued to sexually prey on female inmates by offering commissary and financial support to women who were heading off to prison, mentally disabled, or otherwise especially vulnerable. The Plaintiff contacted her public defender at the Berrien County office and informed him about the incidents, but she asserts that to date, she has not heard back from them pertaining to her attack allegations or her pending charges.

(87)

**PLAINTIFFS DANIELLE WASHINGTON & RAVEN J WRIGHT**

**Suppression of Free Speech, Due Process/Equal Protection Violation, Racial Discrimination, Conspiracy to Violate Civil Rights, Habitual Violations of HUD Housing Quality Standards, Assault, Battery, Intentional Infliction of Emotional Distress, and Gross Negligence**

**U.S. Const. Amend. IV ; U.S. Const. Amend. VIII ; U.S. Const. Amend. XIV ; 42 U.S.C. § 1983 ; 42 U.S.C. § 1985(3) ; 42 U.S.C. § 2000a ; 42 U.S.C.  § 2000d ; 42 U.S.C. § 1437f ; 42 U.S.C. § 1437d ; Title VI of the Civil Rights Act of 1964 ; 24 C.F.R. § 92.209 ; 24 C.F.R. § 5.703**

**Defendants Berrien County, City of Benton Harbor, Continental Management LLC, Steve Cook, Candy Drake-Collier**

(88)

Plaintiffs reallege paragraphs 1-88.

(89)

Thurgood Marshall housing complex offers Section 8 Housing units in Benton Harbor, MI, County of Berrien. Thurgood Marshall, like "River Terrace" and "Sturn Brunson", are all low income housing options managed by Continental Management LLC on behalf of the Benton Harbor Housing Commission.  In the Summer of 2021, Ms. Washington was living in the Thurgood Marshall Housing complex.

(90)

In June or July of 2021, "Fred", Continental Management's on-site maintenance man, erroneously caused the Plaintiffs unit to flood, leading to the destruction of her properties; damaging clothing, electronics, and several other personal items.  In October of 2021, Ms. Washington's unit began to dangerously deteriorate, sinkholes began to appear in the floors, electrical outlets and lights ceased to function, and or sparked when put in use, and destroy items when plugged in, presenting clear and obvious electrical dangers.

(91)

Continental Management's Thurgood Marshall property manager at the time, Katisha Adams, has a sister who shares a child's father in common with the Plaintiff Danielle Washington. Also in the summer of 2021, the Plaintiff's stove went out, preventing her from being able to cook in her home.  Fred the maintenance man, assured the Plaintiff that it would be replaced expeditiously and was supposed to go out and buy another unit, but later relayed to the Plaintiff that he was stopped from doing so by Katisha Adams. During the winter of 2021, the Plaintiffs heat ventilation and hot water ceased to function or perform at all, causing her and her family to endure extremely cold temperatures inside of the apartment, but Continental management's Katisha Adams only provided five space heaters in response to the inhabitability of the unit.

(92)

Approximately around March of 2022, The Plaintiff met with Steve Cook, regional manager of Continental Management, and Candy Drake Collier, Section 8 Manager at the Benton Harbor Housing Commission. At the meeting and in front of Benton Harbor's public housing authority official Defendant Collier-Drake, Steve Cook became belligerent and verbally assaulted the Plaintiff by getting in her face, screaming, and threatening to evict her over her frequent complaints.   Benton Harbor's housing

commission official set in, watched, and did nothing to enforce housing regulations or to defend her program participants.  The Benton Harbor Housing Commission has done nothing to hold Steve Cook and Continental Management accountable for their blatant and habitual violations of laws, regulations, and policies.

(93)

Shortly after the assault by Steve Cook, on April 3rd, 2022 at approximately 9:43 pm, the Plaintiffs home was attacked when a random assailant kicked her door in and ran away.  Plaintiff believes that Steve Cook, Katisha Adams, and or other Continental LLC agents organized the attack on her former residence.  As a result of the attack and the deplorable conditions within the apartment, the Plaintiff decided to move out of the city and ultimately finished evacuating the apartment completely in September of 2022, seeking to salvage what was left of her property.  Danielle Washington, her children, and grandchildren had previously suffered and endured chemical burns due to lead-leaching chemical mixtures added to the City's water supply during Benton Harbor's lead water crisis.  Having those injuries followed-up and compounded by deplorable living conditions, verbal assaults, and physical attacks on the property, all prompted the Plaintiff to leave the State.

(94)

The plaintiff's daughter, Raven Wright, who lives in River Terrace Apartment complex, another low-income housing program in Benton Harbor, administered and managed by the BH Housing Commission, Continental Management LLC, and Steve Cook, was also assaulted by Defendant Cook after complaining about conditions in her low-income housing. Raven Wright moved into River Terrace apartment complex in 2020 and ultimately made several requests for repairs to her apartment's front door, which was broken and unable to lock.  After failing to receive a response from maintenance, and being aware of the issues her mother was suffering, Ms. Wright complained to Steve Cook about the performances and behavior of his workers in River Terrace and Thurgood Marshall when she saw him walking through the River Terrace complex.  Raven Wright asserts that she saw Steve Cook in River Terrace and voiced her complaints about his workers, who regularly entered homes without notice or worker orders, often damaging units, while simultaneously failing to respond to work orders or complaints that were actually submitted to them.  Ms. Wright specifically stated to Steve Cook that "all" his workers "act the same way", to which Defendant Cook angrily screamed and retorted "All you 'project people' act the same way, disturbing the peace" and went on to get in her face and

threaten to evict her from her apartment, saying he could do so based on a 2020 altercation she had shortly after moving in.  Raven retorted that the 2020 incident had nothing to do with his workers entering units without permission, giving notice, or having good cause.  Ms. Wright made complaints about her door being broken and unwarranted intrusions, but was threatened with eviction by Steve Cook in response.  Her complaints began late in 2022, but to date, have yet to be addressed or remediated.  Raven Wright also asserts that she is being charged $687 per unit, which is two to three times more than she is supposed to pay under the low-income housing program, but cannot address the issue with Steve Cook because of his eviction threats and intimidation tactics.   Raven Wright also asserts that she has not received any of her mandatory "Utility Checks", but the Defendants assert to her that they have dispersed them.  Ms. Wright believes that Steve Cook, Continental Management, and others are misappropriating funds and or acting out a conspiracy by overcharging tenants in low-income housing programs and intimidating them into keeping quiet about it by leveraging wrongful eviction threats and other illicit tactics.

(95)

Danielle Washington and Raven Wright are not the only people who have been injured by the Defendants' customs of racial animus and habitual

practices of abusing tenants with eviction threats while failing to honor basic

warranties of habitability.    Despite receiving ample federal funds for

remediations, Continental Management's Black American tenants regularly

suffer inhumane conditions.  On January 16th, 2024, during the coldest times

of the year, the Defendants' water main burst in River Terrace's Tower

building, causing flooding on the third floor and significant property damage

for several citizens in the building, as water flowed down to the first floor.

Two days later, on January 18th, 2024, the 4th District of Michigan's U.S.

Congressman Bill Huizenga questioned the Housing and Urban

Development Secretary about the department's plan for addressing

inhabitable and inhumane conditions at the Benton Harbor's Harbor Towers

building, which had to be evacuated last winter due to busted pipe, and has

dealt with mold, bedbugs, and broken elevators in the government

subsidized housing tower for five years or longer.  River Terrace Tower and

Harbor Tower residents are especially vulnerable as primarily disabled and

elderly persons.

(96)

Conditions in River Terrace and Thurgood Marshall, like the infamous

Harbor Towers, have been deplorable and dysfunctional for years, because

federal subcontractors in Berrien County, like Continental Management and

Steve Cook regularly, berate, intimidate, and conspire against Black residents who speak out against their reckless management.  Steve Cook's verbal assaults and conspiratorial harassment in organizing attacks on Danielle Washington's apartment and berating her daughter, are reflective, indicative, and acted out pursuant to the same custom of racial animus that is rampant in the Berrien County Courthouse, Jails, Michigan State Police patrols, MDHHS, and all other organs of State powers and agency in the County of Berrien.

(97)

## SPECIFIC ALLEGATIONS AGAINST ALL DEFENDANTS

_Defendant Berrien County_, established a custom of racial animus by which all other defendants acted pursuant to when they intentionally discriminated against Black residents by dispersing less than 3% of the Law Enforcement Contract Fund to minority communities while simultaneously allowing unchecked racial bias in policing to cause Black American residents to be arrested at three times their population rate. (See Exhibits A, B, C, D, E, M, O, & T).  Defendant Berrien County further established a custom of racial animus when it intentionally underfunded public defense by contracting local attorneys at low rates as ten thousand a year for decades, while knowing that its criminal defendant base was over-represented by Black

American residents due to its biased policing practices.  The Defendant sustains and enforces its custom of racial animus through judges who subvert court rules while disrespecting defense counsels and their clients, all to deflate resistance and subtly coerce plea bargains for unsubstantiated charges.  (See Exhibit F).  Berrien County has known of these issues of wrongful collusion between police officers, prosecutors, and judges since at least 2005, but has done nothing to remediate the epidemic of malicious prosecutions and conspiracies against citizens' rights being conducted by its public officials and employees. (See Exhibit D).  The County has been unjustly enriched by fines and fees extracted through wrongful, malicious prosecutions.  The Defendant established a custom of racial animus by regularly failing to send court notices to Black American residents, later arresting them on contempt of court charges, and ransoming their freedom for fines and costs.  The Defendant acted out of its custom of racial animus and disregard for the rights of Black residents when it continued to garnish child support payments from Melvin Davis for a substantial period after his daughter had turned eighteen and held R.R., a fourteen year old child, in the filthy, descreated "hole", solitary confinement space for over a year in the Berrien County Jail. (See Exhibit G).  The County placed R.R. in a feces and urinated plastered cell and allowed someone to urinate under his door on a

regular basis.  The County of Berrien acted out of racial animus when former Sheriff Leonard Paul Bailey slandered Charase Dorsey by telling her aunt she had been under investigation for counterfeiting and drug trafficking. Berrien County established a custom of racial animus when Judge Lasata and others regularly violated court rules, abused defense attorneys, and subverted the Constitutional rights to due process and impartial tribunals by cooperating and validating malicious prosecutions like Charase Dorsey's, which Judge Pasula should have recognized as a fraud upon her court at charging. (See Exhibits P & R).

(98)

The County of Berrien acted out of racial animus when Prosecuting Attorney Steven Pierangeli and Berrien County Prosecutor's Office charged and pursued factually unsubstantiated "felon in possession of ammunition" charges. (See Exhibits P & R). Berrien County acted out of its custom of racial animus when it's Deputy Sheriff Shawn Yech knowingly swore false information on the MSP criminal search warrant complaint and supplements. Finally, the Defendant acted out racial animus and evidenced a custom of racial animus when its assistant prosecuting attorney Taylor Koch used her position with the County to tortiously interfere with an employment contract when she personally called Temesia Davis's employer and informed them

she had been convicted of a felony prior to the appeals process completing. Defendant Berrien County expressed its custom of racial animus and committed an unlawful seizure, equal protection violation, and cruel and unusual punishment when its guards attacked, stripped, and starved Jasmine McCoy in solitary confinement and restraints for three days without medical attention.

(99)

*Defendant Steven Pierangeli* acted out of Berrien County's custom of racial animus when he initiated unsubstantiated criminal charges against Charase Dorsey to help cover-up a fabricated warrant and illegal search and seizure conducted by the South West Michigan SWET narcotics team.  Defendant Pierangeli acted out of racial animus when he offered a plea deal to Charase Dorsey on charges that he knew he had no chance of winning at trial and were not substantiated under law at the time of charging.  Defendant Pierangeli, as a leader in the Berrien County Prosecutor's office, contributed to establishing a culture and custom of regular malicious prosecutions, rampant over-charging, and other abuses of his official powers. (See Exhibits P & Q).

(100)

*Defendant Mark Sanford* acted out Berrien County's custom of racial animus when he filed and pursued unsubstantiated charges against Virece Berry. Defendant Sanford continued to act out of racial animus when caused Mr. Berry to be held on house arrest without any evidence or just cause for doing so.  Defendant Sanford, as a leader in the Berrien County Prosecutor's office, contributed to establishing a culture and custom of regular malicious prosecutions, rampant over-charging, and other abuses of his official powers. (See Exhibit Q).

(101)

*Defendant Taylor Koch* acted out Berrien County's custom of racial animus against Black Americans when she vindictively pursued charges against Temesia Davis, who previously refused to testify on behalf of one Koch's prosecution, a clear conflict of interest.  Taylor Koch pursued, accepted, and defended a plea bargain from Ms. Davis while knowing that she was heavily medicated after surgery, an unethical display of racial animus.  Taylor Koch further acted out of racial animus when she personally called Temesia Davis's employer to get her terminated as retribution for refusing to testify on Attorney Koch's behalf.  Taylor Koch further acted pursuant to Berrien County's custom of racial animus when she participated in the malicious prosecution of Charase Dorsey by filing a motion to dismiss the unwarranted

and unsustainable charge shortly before trial was scheduled to begin. (See Exhibit R).

(102)

_Defendant Leonard Paul Bailey_, long term elected Berrien County Sheriff helped to establish Berrien County's custom of racial animus through his years of allowing the Berrien County Jail and the office of the Sheriff to be used as a personal tool of retribution and oppression for local law enforcement.  Defendant Paul Bailey acted out gross negligence when he allowed a fourteen year old child to be held in solitary confinement within a feces and urine filled cell for a year.  Allegedly, during his tenure as the Sheriff official in control of the Berrien County jail, his deputies regularly exchanged commissary and money for sexual acts with inmates.  Defendant Bailey acted out of racial animus when he told a resident that Charase Dorsey had been under investigation for counterfeiting money and drug trafficking when he was aware that those facts were untrue.  Through poor management, Defendant Bailey maintained and administered the Berrien County Jail in a reckless manner that established a custom and culture of regularly exposing inmates to inhumane conditions. (See Exhibits U & AA).

(103)

_Defendant Jeremiah Gauthier_ acted pursuant to Berrien County's custom of racial animus when he falsified criminal warrant paperwork by swearing that Charase Dorsey had been under investigation for drug distribution and counterfeiting money.   Defendant Gauthier further falsified warrant paperwork by stating he found an "unknown" substance in the Plaintiff's Bible.   The Plaintiff acted pursuant to Berrien County's custom of racial animus when he initiated criminal charges against the Plaintiff stemming from a fabricated warrant from which there was no counterfeit money evidence. (See Exhibit P).

(104)

_Defendant Shawn Yech_ acted pursuant to Berrien County's custom of racial animus when he knowingly swore to false information as a witness for a warrant application.   Shawn Yech knew that he was not aware of any investigation into Charase Dorsey before the raid of her home.  Shawn Yech knew that he did not see or know of any counterfeit money allegations at the time of the raid on Charase Dorsey's home.  Shawn Yech knew that he did not see any brown powder-like substance removed from Charase Dorsey's Bible when he served as a witness to the warrant application. (See Exhibit P).

(105)

_Defendant Jonathan Bowman_ acted out of Berrien County's custom of public office abuses when he spoke openly in front of inmates about his participation in an ongoing custom of taking female inmates off camera and having sex with them in exchange for commissary supplies and financial support.

(106)

_Defendant Jacob Will_ acted out of Berrien County's custom of public office abuses when he spoke openly in front of inmates about his ability to and participation in taking female inmates off camera and having sex with them in exchange for commissary supplies and financial support.  Jacob Will acted out a conspiracy against the rights of R.R. when he collaborated with Berrien County Jail leaders to extend his stay in the facility's hole, solitary confinement area within a feces and urine contaminated cell.

(107)

_Defendant City of Benton Harbor_ acted out Berrien County's custom of racial animus and public office abuse when multiple Benton Harbor Public Safety officers, including public safety director Daniel McGinnis, officer Michael Clark, and others came to work place of Ieshia Blackwell to antagonize her and agitate her mental health and anxiety issues.  The City of Benton Harbor violated the Constitutional rights of Carl Coleman and his

Estate when its Public Safety Department directed Berrien County Sheriff's to raid his home shortly after his death when they knew that he could not be charged with a crime and had not been questioned by police for possessing a murder weapon or being involved with a murder. (See Exhibit S). The City of Benton Harbor acted pursuant to Berrien County's custom of racial animus when its Section 8 housing official supported Steve Cook in his intimidation of Danielle Washington by failing to address his attack in any way.  The City of Benton Harbor acted pursuant to Berrien County's custom of racial animus when it allowed Harbor Towers, River Terrace, and Thurgood Marshall apartments to be grossly mismanaged and injurious to the City's most vulnerable populations of elderly and disabled persons. (See Exhibits X and Z).

(108)

*Defendant Daniel E. McGinnis* acted pursuant to Berrien County's custom of public office abuse when he directed Berrien County Sheriff's to raid Carl Coleman's apartment the day of his death.  Defendant McGinnis acted to suppress Ieshia Blackwell's right to express her grievances in federal civil court when he showed up to her place of employment to antagonize and intimidate her as retribution for filing suit against him.  Defendant Daniel McGinnis acted pursuant to Berrien County's custom of collusion and

conspiracy against citizen rights when he directed Berrien County Sheriff's to retain items taken from Carl Coleman. (See Exhibits S).

(109)

_Defendant Benton Charter Township_ acted pursuant to Berrien County's custom of racial animus when its agents initiated a malicious prosecution against Virece Berry as a favor for local Caucasian resident, Kylie Benson. (See Exhibits J, K, L, Q).

(110)

_Defendant Officer John Visel_  acted pursuant to Berrien County's custom of racial animus when its agents initiated a malicious prosecution against Virece Berry as a favor for a local resident.  Defendant Visel initiated a criminal complaint against Virece Berry while having exculpatory evidence within his possession that directly contradicted the story of the complaining witness and corroborated the story of Virece Berry. (See Exhibits J, K, Q).

(111)

_Defendant Detective Michael DenDooven_ acted pursuant to Berrien County's custom of racial animus against Black Americans when he initiated a criminal complaint against Virce Berry after viewing video and picture evidence showing that Virce Berry was a victim and not the aggressor. (See Exhibits J, K, Q).

(112)

_Defendant State of Michigan_ acted pursuant to Berrien County's custom of racial animus when Berrien County was found to be the only County in the State where Mexican Americans are more likely to be pulled over by State Police Troopers. (See Exhibit N).  The State of Michigan further established a custom of racial animus when Michigan State Police were found to have established and be operating pursuant to an "informal quota" system that focuses patrols on primarily Black American areas. (See Exhibit W).  The State of Michigan acted pursuant to Berrien County's custom of racial animus when its MDHHS CPS agent colluded with Benton Township police officers to frame Virece Berry by assisting with his wrongful arrest at the MDHHS building and submitting evidence he sent them of being attacked, to police as evidence of him being an aggressor.  The State of Michigan acted pursuant to Berrien County's custom of racial animus and public office abuse when its CPS agents sent confidential victim information to police as corroborating evidence of false allegations. (See Exhibits J, K, Q).  The State of Michigan acted according to Berrien County's custom of racial animus when its MSP Detectives initiated a fraudulent search  and malicious prosecution by falsifying a warrant application and initiating unsubstantiated charges against Charase Dorsey. (See Exhibits P & R).  The State of

Michigan acted out Berrien County's custom of conspiracy against citizen rights when Michigan State trooper Gary Fleming Jr. pulled over a memorial parade for decedent Carl Coleman without probable cause at the direction of Benton Harbor public safety officers and in support of their harassment of Ieshia Blackwell and her family.  The State of Michigan acted pursuant to Berrien County's custom of racial animus when its state funded public defender's office established a habitual custom of pressuring Black American residents to plea to unsubstantiated charges brought by the Berrien County's Prosecutor's Office.  The State of Michigan acted pursuant to a custom of racial animus against Black residents when its Judicial Commission's failed to speak to or remedy the consequential injuries born out the habitual court rule violations and citizen's rights abuses acted out by Judge Lasata and other Berrien County judges. (See Exhibit F).  The State of Michigan acted according to Berrien County's custom of racial animus against Black Americans when Virece Berry was banned from the Berrien County Public Defender's Office for repeatedly requesting his right to trial, refusing to accept a plea bargain, and demanding that his appointed public defender prepare his trial defense.  The State of Michigan's Friend of Court discriminated against Melvin Davis Sr. when it over charged him in child support fees for a substantial period of time. (See Exhibit G).

(113)

_Defendant  Detective  William  Ashley_ acted  pursuant  to  Berrien  County's
custom  of  racial  animus  when  he  falsified  criminal  warrant  paperwork  by
swearing  that  Charase  Dorsey  had  been  under  investigation  for  drug
distribution  and  counterfeiting  money.   Defendant  Ashley  further  falsified
warrant  paperwork  by  categorizing  the  Plaintiff's  personal  cell  phone  as
"office  equipment"  in  an  investigative  counterfeit  money  raid  on  Charase
Dorsey's  home.   The  Plaintiff  acted  pursuant  to  Berrien  County's  custom  of
racial  animus  when  he  spread  rumors  through  the  local  law  enforcement
community  about  Charase  Dorsey  counterfeiting  money  and  selling  drugs  to
Paul  Bailey.    Defendant  Ashley,  after  failing  to  retain  evidence  of
counterfeiting  in  Mrs.  Dorsey's  home,  initiated  false  criminal  charges
against  the  Plaintiff  stemming  from  what  he  knew  to  be  a  fabricated  warrant
application. (See Exhibits P & R).

(114)

_Defendant Michigan Department of Human Health and Services_ (MDHHS)
acted  pursuant  to  Berrien  County's  custom  of  racial  animus  when  MDHHS
CPS  agents  colluded  with  Benton  Township  police  officers  to  frame  Virece
Berry  by  assisting  with  his  wrongful  arrest  at  the  MDHHS  building.   The
State  of  Michigan  acted  pursuant  to  Berrien  County's  custom  of  racial

animus and public office abuse when its CPS agents sent confidential victim information to police as corroborating evidence of false allegations. MDHHS acted pursuant to Berrien County's custom of racial animus when they pursued child protective claims against the Black American mother of Virece Berry's children but refused to pursue child protective claims against the Caucasian mother of Virece Berry's children when they became aware of her race, and instead, used their confidential relationship with Virece Berry to assist in his false arrest and malicious prosecution.  MDHHS acted pursuant to a custom of racial animus when it refused to provide accommodations to Karl Cotton and denied his company Son of Man Inc. equal pay and rights to participate in Federal and or State programs. (See Exhibit H, I).

(115)

_Defendant Kevin Mackin_, acted pursuant to Berrien County's custom of racial animus and bias against Black Americans when he had Virece Berry banned from the Berrien County Public Defender's office because he demanded the office follow his directions and proceed to building his trial defense.  Defendant Mackin wrongfully and irrationally advised Virece Berry to stop paying his house arrest fees, causing him to be arrested and incarcerated, at which time Defendant Mackin pressured the Plaintiff to

accept a plea and threatened him with being sentenced to life in prison. Attorney Mackin also failed to inform Virece Berry of one of his court hearings and the Berrien County Courthouse sent the hearing notice to an address that Mr. Berry never lived at.  As a result, Mr. Berry was arrested and confined for contempt of court due to Attorney Mackin's negligence.

(116)

*Defendant Caleb Grimes* allegedly acted pursuant to Berrien County's custom of racial animus when he collaborated with Assistant Prosecutor Taylor Koch's and Judge Pasula's goal of punishing Temesia Davis for refusing to testify in a previous prosecution by pressuring her to accept a plea bargain while she was intoxicated on pain pills and failing to file her emergency motion to withdraw her plea for six weeks after she requested it. Caleb Grimes also allegedly communicated with Judge Pasula without his client's knowledge the day of her motion-to-withdraw hearing.

(117)

*Defendant Department of Housing and Urban Development*: The Defendant failed to administer federal programs without discrimination when it allowed primarily Black American tenants to be exposed to regular housing discriminations and violations of warranties of habitability, evidenced by the long standing problems in River Terrace, Thurgood Marshall, and Harbor

Towers. (See Exhibits X & Z).  Pipes regularly bursts, electrical problems, pests infections, and security issues, like broken front doors that cannot lock and habitually inoperative elevators, persists while federal subcontractors empowered to administer housing programs berate, threatens, and shouts in the face of any one who speaks up and out against their mismanagement, fraud, and misappropriation of funds.  Through misfeasance and nonfeasance, HUD has established a lower quality of living and life for Black American tenants enlisted in its Berrien County housing programs.

(118)

_Defendant Continental Management LLC.:_ Continental Management LLC established a custom of habitual breaches of warranties of habitability and retaliatory threats, attacks, and conspiracies in response to tenants complaints, as evidenced by Steve Cook's assaults and threats to Danielle Washington and Raven Wright. (See Exhibits X & Y).  Continental Management LLC. habitually overcharged Raven Wright and others while attempting to use threats and other tactics to keep them quiet about it. Continental Management overcharged its low-income program tenants for inadequate housing while simultaneously receiving and holding millions of dollars in federal funds.

(119)

94

<u>Defendant Steve Cook</u> acted pursuant to Berrien County and Continental Management's customs of racial animus and tenant abuse when screamed and shouted threats in the face of tenants Danielle Washington and Raven Wright in retaliation for having to address their complaints about his poor management of properties in Benton Harbor, MI.  Steve Cook and Katisha Adams acted out a conspiracy when they hired local criminals to attack Danielle Washington's apartment after her consistent complaints related to her apartment's condition.  Steve Cook has been integral to establishing and maintaining a low quality of living through his belligerent tirades and threats levied against tenants to suppress their complaints about his misfeasance and nonfeasance. (See Exhibit X & BB).

(120)

## COUNT. I

## VIOLATIONS OF FOURTEENTH AMENDMENT DUE PROCESS & EQUAL PROTECTION: ALL DEFENDANTS

(121)

Plaintiffs reassert paragraphs 1-121.

(122)

The Defendants violated the Plaintiffs Constitutional rights to due process and equal protection by subjecting them to detrimentally and substantially

different procedures and treatments than those normally applied to Caucasian residents in Berrien County, Michigan.  The Defendants regularly and habitually failed to provide proper notice of court hearings, falsified sworn documents, and colluded in conspiracies against the Plaintiff's rights while acting according to Berrien County's custom of racial animus against Black Americans.  Defendant Berrien County acted out its custom of racial animus when its agents avered from proper process and beat, stripped, and starved Jasmine McCoy in Berrien County jail.

(123)

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV.  "The substantive due process aspect of the Fourteenth Amendment protects against conscience-shocking deprivations of liberty." In re Flint Water Cases, 960 F.3d 303 (6th Cir. 2020).  "The plaintiff may prove '(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights

violations.'" *Id.* (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)). *Colemon v. City of Cincinnati*, No. 21-5968, at *7 (6th Cir. Aug. 9, 2023).

(124)

"The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. See *Carey v. Piphus*, 435 U.S. 247, 259–262, 266–267, 98 S.Ct. 1042, 1043, 1050–1052, 1053, 1054, 55 L.Ed.2d 252, (1978).  The threshold element of an equal protection claim is disparate treatment. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). "To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (quoting *Club Italia Soccer & Sports Org., Inc.*, 470 F.3d at 298)). *Spoors v. Kent Cnty. Corr. Facility*, 1:23-cv-501, at *22 (W.D. Mich. July 14, 2023).  "In *Monell v. Department of Social Services,* 436 U.S. 658, 694 [ 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611] (1978), the Supreme Court held that a local government can be liable in a § 1983 action when its official policy or governmental custom is responsible for a deprivation of

constitutional rights. Apparently recognizing that a local government's "official policy" can originate from more than one source, the Court stated ". . . it is when execution of a government's policy or custom, *whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy,* inflicts the injury that the government as an entity is responsible under § 1983." *Id.* (emphasis added). *See also, Owen v. City of Independence,* 445 U.S. [622,] 657-658 [ 100 S.Ct. 1398, 1418-1419, 63 L.Ed.2d 673] (1980). Thus, the Board's lack of control does not necessarily preclude a finding of liability on the part of the County. We must determine whether the nature and duties of the Sheriff are such that his acts may fairly be said to represent the county's official policy with respect to the specific subject matter.' *Gaborik v. Rosema*, 599 F. Supp. 1476, 1479 (W.D. Mich. 1984). A judicial proceeding lacking a neutral arbiter is a violation of due process. "The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decision-making process. See *Carey v. Piphus*, 435 U.S. 247, 259–262, 266–267, 98 S.Ct. 1042, 1043, 1050–1052, 1053, 1054, 55

L.Ed.2d 252, (1978). The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. See *Mathews v. Eldridge*, 424 U.S. 319, 344, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976). At the same time, it preserves both the appearance and reality of fairness, "generating the feeling, so important to a popular government, that justice has been done," *Joint Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 172, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him." Marshall v. Jerrico, Inc., 446 U.S. 238, 242, 100 S. Ct. 1610, 1613, 64 L. Ed. 2d 182 (1980).  Berrien County has established a habitual inappropriate and injurious custom of  lack of judicial impartiality against Black American residents.

(125)

The Defendants violated the 14th Amendment's procedural and substantive due process and equal protection protections when they customarily and habitually failed to provide notice of court hearings, acted pursuant to an ingrained tradition of racial animus by falsifying sworn documents, initiating

multiple malicious prosecutions, causing several false imprisonments, and regularly using public offices as tools of personal retribution, as evidenced by Taylor Koch's attack on Temesia Davis and Berrien County judges' custom of court rule violations, ethics violations, and knowingly validating falsified and legally unsubstantiable plea bargains and plea convictions. "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice. Buck v. Davis, 137 S. Ct. 759, 197 L. Ed. 2d 1 (2017).

(126)

## COUNT II. RACIAL DISCRIMINATION

## VIOLATIONS OF 42 U.S.C. § 2000a ; 42 U.S.C.  § 2000d ; 42 U.S.C. § 1983

## ALL DEFENDANTS

(127)

Plaintiffs reassert paragraphs 1-127.

(128)

The Defendants violated Constitutional rights and federal civil rights laws by acting pursuant to Berrien County's custom of racial animus when they colluded to initiate and pursue fabricated criminal charges against Anisha Bird, Virece Berry, and Charase Dorsey, and intentionally forbade Karl Cotton, Virece Berry, and Melvin Davis from government services by subjecting them to arbitrary disparate treatment in the administration of federally funded programs. Defendant Berrien County racially discriminated when its guards attacked, stripped, and starved Jasmine McCoy.

(129)

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §  2000d.  "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a.

(130)

"Every person who, under color of any statute, ordinance, regulation, custom,  or usage, of any State or Territory or the District of Columbia,

subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity." 42 U.S.C. § 1983. "In *Monell v. Department of Social Services,* 436 U.S. 658, 694 [ 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611] (1978), the Supreme Court held that a local government can be liable in a § 1983 action when its official policy or governmental custom is responsible for a deprivation of constitutional rights. Apparently recognizing that a local government's "official policy" can originate from more than one source, the Court stated ". . . it is when execution of a government's policy or custom, *whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy,* inflicts the injury that the government as an entity is responsible under § 1983." *Id.* (emphasis added). *See also, Owen v. City of Independence,* 445 U.S. [622,] 657-658 [ 100 S.Ct. 1398, 1418-1419, 63 L.Ed.2d 673] (1980). Thus, the Board's lack of control does not necessarily preclude a finding of liability on the part of the County. We must determine whether the nature and duties of the Sheriff are such that his acts may fairly be said to represent the county's official policy with respect to the specific subject matter.' *Gaborik v. Rosema*, 599 F. Supp. 1476, 1479 (W.D. Mich.

1984).  "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice. Buck v. Davis, 137 S. Ct. 759, 197 L. Ed. 2d 1 (2017).

(131)

The Defendants violated Constitutional rights to be free from unlawful searches and seizures, cruel and unusual punishments, freedom of speech, due process, equal protection, and federal civil rights laws by acting pursuant to Berrien County's custom of racial animus when they colluded to initiate and pursue wrongful and  fabricated contempt of court and criminal charges against Anisha Bird, Virece Berry, and Charase Dorsey.  The Defendants further intentionally forbade Karl Cotton, Virece Berry, and Melvin Davis from government services by subjecting them to arbitrary disparate treatment in the administration of federally funded programs.

(132)

## COUNT III. VIOLATION OF THE FIRST AMENDMENT: RETALIATORY SUPPRESSION OF FREE SPEECH

**Defendants: Berrien County, City of Benton Harbor, Daniel E. McGinnis, State of Michigan, Continental Management, Steve Cook**

(133)

Plaintiffs reallege paragraphs 1-133.

(134)

The Defendants acted pursuant to Berrien County's custom of racial animus and abuse of public offices when they suppressed and or retaliated against Plaintiffs Jasmine McCoy, Ieshia Blackwell, Karl Cotton Sr., Danielle Washington, Raven J. Wright, and Virece Berry for expressing constitutionally protected free speech.

(135)

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I

(136)

"Retaliation against an individual for exercise of his First Amendment rights is itself a First Amendment violation." *Zilich v. Longo,* 34 F.3d 359, 364 (6th Cir. 1994)" *Spruytte v. Govorchin*, 961 F. Supp. 1094, 1102 (W.D. Mich. 1997)  "Here, plaintiff ostensibly has claimed that he was retaliated against

for exercise of his First Amendment right to bring a lawsuit. Consequently,
plaintiff need not allege conduct that constitutes an "egregious abuse of
authority" or that "shocks the conscience." *See Riley,* 893 F. Supp. at
715-16." *Spruytte v. Govorchin*, 961 F. Supp. 1094, 1102 (W.D. Mich. 1997).

(137)

"Plaintiff first claims that Defendants retaliated against her for
constitutionally protected speech. To support such a claim, Plaintiff must
show the following elements: (1) that the plaintiff was engaged in a
constitutionally protected activity; (2) that the defendant's adverse action
caused the plaintiff to suffer an injury likely to chill a person of ordinary
firmness from continuing to engage in that activity; and (3) that the adverse
action was motivated at least in part as a response to the exercise of the
plaintiff's constitutional rights." *Stephenson v. Cent. Mich. Univ.*, 897 F.
Supp. 2d 556, 564 (E.D. Mich. 2012).  Plaintiffs Ieshia Blackwell and Virece
Berry assert that they were engaged in protected free speech of civil
litigation and criminal defense building when they were punished in
retribution by the defendants when they began frequented Ms. Blackwell's
place of employment, surveilling her home, ordered an unreasonable raid on
her son's home, and banned Virece Berry from the Public Defender's Office

for voicing his complaints about their performance and responsiveness to his directions.  Jasmine McCoy was beaten, stripped, and starved in response to her voicing that she felt like she might kill herself.  Karl Cotton was denied the right and opportunity to advertise and recruit patients and employees for his home care service company while being denied referrals from MDHHS in retaliation for successfully establishing the organization.

(138)

"Likewise, the Constitution protects citizens from retaliation by public officials for complaining about violations of their civil rights. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283-84 (1977). This protection from retaliation is independent from supplemental schemes established by Title VII and other remedial civil rights statutes. See Thaddeus-X v. Blatter, 175 F.3d 378, 386-87 (6th Cir. 1999) (en banc). Retaliation for filing an administrative complaint that is a predicate for suit violates the First Amendment. See DeWalt v. Carter, 224 F.3d 607, 618 (7th Cir. 2000) (holding that termination of prisoner's job in response to his filing of a grievance was unconstitutional retaliation for exercise his right of access to the Courts). More broadly, retaliation against a citizen for exercising her First Amendment rights in almost any circumstance violates the

Constitution. See McCurdy v. Montgomery County, Ohio, 240 F.3d 512, 520 (6th Cir. 2001) (retaliation against plaintiff by police officer for the plaintiff's rude comments violated his First Amendment rights). *Ebelt v. the County of Ogemaw*, 231 F. Supp. 2d 563, 570 (E.D. Mich. 2002).

(139)

The Defendants violated the first amendment of the Constitution when they retaliated against the Plaintiffs for filing suit and expressing their grievances by harassing Ieshia Blackwell at work, surveilling her, raiding her son's home on the day of his death, and using CPS evidence against Virece Berry, colluding with his unlawful arrest at MDHHS, and banning him from the Berrien County Public Defender's office after he expressed complaints about their performance.  The Defendants actions caused the Plaintiffs to suffer mental anguish, anxiety attacks, and loss of income.

(140)

## COUNT IV. VIOLATIONS OF THE FOURTH AMENDMENT: UNLAWFUL SEARCHES AND SEIZURES

**Defendants: Berrien County, Benton Township, Michael DenDooven, John Visel, State of Michigan, William Ashley, Jeremiah Gauthier, Shawn Yech, Daniel E. McGinnis**

(141)

Plaintiffs reallege paragraphs 1-141.

(142)

The Defendants violated the Plaintiffs right to be free from unlawful searches and seizures when they acted pursuant to Berrien County's custom of racial animus by searching and seizing Plaintiffs Charase Dorsey and Virece Berry pursuant to and as the fruit of fabricated search warrant affidavits and arrest warrants not based on truth and or probable cause. Defendant Berrien County committed an unlawful seizure when its guards attacked, stripped, and starved Jasmine McCoy.

(143)

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or

affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

(144)

"As a general rule, "the Framers of the [ Fourth] Amendment balanced the interests involved and decided that a seizure is reasonable only if supported by a judicial warrant based on probable cause." *United States* v. *Place, supra*, at 722 (BLACKMUN, J., concurring in judgment)." *New York v. Class*, 475 U.S. 106, 129 n.4 (1986).  "In *Monell v. Department of Social Services,*436 U.S. 658, 694 [ 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611] (1978), the Supreme Court held that a local government can be liable in a § 1983 action when its official policy or governmental custom is responsible for a deprivation of constitutional rights. Apparently recognizing that a local government's "official policy" can originate from more than one source, the Court stated ". . . it is when execution of a government's policy or custom, *whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy,* inflicts the injury that the government as an entity is responsible under§ 1983." *Id.* (emphasis added). *See also, Owen v. City of Independence,* 445 U.S. [622,] 657-658 [ 100 S.Ct. 1398, 1418-1419, 63 L.Ed.2d 673] (1980). Thus, the Board's lack of control does

not necessarily preclude a finding of liability on the part of the County. We must determine whether the nature and duties of the Sheriff are such that his acts may fairly be said to represent the county's official policy with respect to the specific subject matter.' *Gaborik v. Rosema*, 599 F. Supp. 1476, 1479 (W.D. Mich. 1984).

(145)

"First, if a warrant is based on a knowing or reckless falsehood contained in the supporting affidavit, the warrant is invalid under *Francks v. Delaware,* 438 U.S. 154 (1978)." *U.S. v. Meixner*, 128 F. Supp. 2d 1070 (E.D. Mich. 2001).  "A defendant may be entitled to have a warrant voided when the warrant affiant's statements were deliberately false or made in reckless disregard for the truth and the affidavit's remaining content is insufficient to establish probable cause. *Franks v. Delaware*, 438 U.S. 154, 156; 98 S.Ct. 2674; 57 L.Ed.2d 667 (1978). The burden rests on the defendant to establish by a preponderance of the evidence that the affidavit contains a reckless or deliberate falsehood and that with this material "set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Franks*, 438 U.S. at 156. *Johnson v. Morrison*, 1:21-cv-549, at *11 (W.D. Mich. May 11, 2022).  In regards to the search and arrest warrants issued

against Plaintiffs Charase Dorsey and Virece Berry, those warrants' affiants' statements were deliberately false or made in reckless disregard for the truth, and as such, those warrants were not legally lawful and the arrest and searches performed pursuant to them were performed under the color of the law.

(146)

The Defendants acted pursuant to Berrien County's custom of racial animus and abuse of public office when they knowingly used fabricated and unsubstantiated statements to receive arrest and search warrants that led to Plaintiff Charase Dorsey having a heart attack and Virece Berry losing over forty thousand dollars in unreturned fees and fines. Both Plaintiffs had their charges dropped just before trial, after long and stressful ordeals against weaponized State and County offices. Defendant Berrien County committed an unlawful seizure when its guards attacked, stripped, and starved Jasmine McCoy in retaliation for seeking their attention. The County of Berrien engaged in a grossly unreasonable seizure of then fourteen year old R.R. when they exposed him adult sexual predators, known violent threats, and then placing him in a feces and urine defiled cell as punishment for defending himself against attacks from other inmates he should not have

been exposed to due to their relationships to the victim in his case and their violent and dangerous charges they were being held on.

(147)

**COUNT V. FALSE ARREST: FOURTH AMENDMENT VIOLATION**

**Defendants: Berrien County, Benton Township, Michael DenDooven, John Visel, State of Michigan, William Ashley, Jeremiah Gauthier, and Shawn Yech**

(148)

Plaintiffs reassert paragraphs 1-148.

(149)

Defendants acted pursuant to Berrien County's custom of racial animus and abuse of public offices when they arrested Plaintiffs Virece Berry and Charase Dorsey pursuant to knowingly fabricated and untruthful warrant applications without probable cause.

(150)

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

(151)

"Under Michigan law, the elements of false arrest are: 1) an arrest; 2) of a person; 3) who is innocent of the charge on which he is arrested; 4) by the defendant or at his instigation; 5) without legal justification. *See Lewis v. Farmer Jack Div., Inc.,* 415 Mich. 212, 327 N.W.2d 893, 901 (Williams, J. dissenting). In turn, the elements of false imprisonment are: 1) actually confining another; 2) intentionally performing the act of confining another; 3) the act of confining another was performed without legal justification; and 4) the victim was aware of the confinement. *See Moore v. City of Detroit,* 252 Mich. App. 384, 652 N.W.2d 688, 691 (2002). Michigan courts have held that false arrest is one type of false imprisonment; when a person is falsely arrested, he or she is always falsely imprisoned." *Romanski v. Detroit Entertainment, L.L.C.*, 265 F. Supp. 2d 835, 846 (E.D. Mich. 2003).

(152)

"Claims of false arrest and false detention are cognizable under the Fourth Amendment (as applied to states through the Fourteenth Amendment, *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985)), which prohibits "unreasonable searches and seizures." U.S. Const. Amend. IV. The Fourth Amendment clearly establishes the plaintiff's right to be free from "unreasonable . . .

seizures," U.S. Const., amend. IV (although for qualified immunity, the analysis of the right must be more granular, *Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("[t]his inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition")). "[A] false arrest claim under federal law requires a plaintiff to [plead and] prove that the arresting officer lacked probable cause to arrest the plaintiff." *Akima v. Peca*, No. 21-10080, at *8-9 (E.D. Mich. Nov. 7, 2022).

(153)

"In Michigan, false-arrest and false-imprisonment claims require a showing that the officers lacked probable cause." *Lewis v. Farmer Jack Div., Inc.*, 327 N.W.2d 893, 894 (Mich. 1982); *Gooch v. Wachowiak*, 89 N.W.2d 496, 499-500 (Mich. 1958)" *Allen v. City of Ecorse*, No. 21-1268, at *1 (6th Cir. Nov. 16, 2021).  "[T]he general concept of false imprisonment as an 'unlawful restraint of an individual's personal liberty' is broader than, but includes, a false arrest involving law enforcement." *Id.* (quoting *Clarke v. KMart Corp.* , 197 Mich.App. 541, 495 N.W.2d 820 (1992) ). Or, put differently, "false arrest is one type of false imprisonment; when a person is falsely arrested, he or she is always falsely imprisoned." *Romanski v. Detroit*

*Entm't* , 265 F.Supp.2d 835, 846 (E.D.Mich.2003). *Smith v. Twp. of Prairieville*, 194 F. Supp. 3d 658, 671 (W.D. Mich. 2016).

(154)

Defendants acted pursuant to Berrien County's custom of racial animus and abuse of public offices when they arrested Plaintiffs Virece Berry and Charase Dorsey pursuant to knowingly fabricated and untruthful warrant applications without probable cause and while being possession of exculpatory evidence proving the Plaintiffs innocence at the time of arrest.

(155)

**COUNT VI. FALSE IMPRISONMENT: FOURTH AMENDMENT VIOLATION**

**Defendants: Berrien County, Benton Township, Michael DenDooven, John Visel, State of Michigan, William Ashley, Jeremiah Gauthier, and Shawn Yech,  Mark Sanford, Steven Pierangeli**

(156)

Plaintiffs reassert paragraphs 1-156.

(157)

The Defendants committed false imprisonment when they wrongfully arrested, detained in the Berrien County Jail, and caused the Plaintiffs to

have their liberties restricted by house arrest and other bail conditions while facing legally unsustainable charges all done and initiated without probable cause.

(158)

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

(159)

"False imprisonment, by contrast, is "an unlawful restraint on a person's liberty or freedom of movement." *Id.* In other words, a false imprisonment "is broader than, but includes, a false arrest involving law enforcement." *Moore v. City of Detroit,* 252 Mich.App. 384, 387, 652 N.W.2d 688, 690 (2002). The elements of false imprisonment are (1) an act committed with the intention of confining another, (2) the act directly or indirectly results in such confinement, (3) the person confined is conscious of his confinement, and (4) the imprisonment was false—without right or authority to confine. *Id.* at 387–88, 652 N.W.2d at 691. *Valdez v. United States*, 58 F. Supp. 3d

795, 829 (W.D. Mich. 2014).  The Plaintiffs were falsely imprisoned beyond

their arrest, but also as they were transported and booked into the Berrien

County Jail, confined in cells there, and released with restrictive bail

conditions that caused them to remain confined within the custody of the

State.

(160)

"A person released on parole is "in custody" for purposes of the district

courts' habeas corpus jurisdiction. It is true, of course, that the parolee is

generally subject to greater restrictions on his liberty of movement than a

person released on bail or his own recognizance. And some lower courts

have reasoned that this difference precludes an extension of the writ in cases

such as the one before us. On the other hand, a substantial number of courts,

perhaps a majority, have concluded that a person released on bail or on his

own recognizance may be "in custody" within the meaning of the statute."

*Hensley v. Municipal Court*, 411 U.S. 345, 348-49 (1973).

(161)

"There is no restraint on movement until a seizure occurs or bond terms are

imposed. Damage to reputation and all of its attendant harms also tend to

show up after arrest." *Ahlers v. Schebil*, 966 F. Supp. 518, 530 (E.D. Mich.

1997).  "A person facing serious criminal charges is hardly freed from the state's control upon his release from a police officer's physical grip. He is required to appear in court at the state's command. He is often subject, as in this case, to the condition that he seek formal permission from the court (at significant expense) before exercising what would otherwise be his unquestioned right to travel outside the jurisdiction. Pending prosecution, his employment prospects may be diminished severely, he may suffer reputational harm, and he will experience the financial and emotional strain of preparing a defense. A defendant incarcerated until trial no doubt suffers greater burdens. That difference, however, should not lead to the conclusion that a defendant released pretrial is not still "seized" in the constitutionally relevant sense . . . He is equally bound to appear, and is hence "seized" for trial, when the state employs the less strong-arm means of a summons in lieu of arrest to secure his presence in court. This conception of a seizure and its course recognizes that the vitality of the Fourth Amendment depends upon its constant observance by police officers. For [the police officer], the Fourth Amendment governed both the manner of, and the cause for arresting Albright. If [the police officer] gave misleading testimony at the preliminary hearing, that testimony served to maintain and reinforce the unlawful haling

of Albright into court, and so perpetuated the Fourth Amendment violation."

*Ahlers v. Schebil*, 966 F. Supp. 518, 531 (E.D. Mich. 1997).

(162)

The Defendants falsely imprisoned the Plaintiffs when they acted pursuant to Berrien County's custom of racial animus and abuse of public office when they arrested, transported, held, charged, released on house arrest, and pursued serious criminal charges against Charase Dorsey and Virece Berry without probable cause and while being in possession of exculpatory evidence and facts.

(163)

## COUNT VII. MALICIOUS PROSECUTION: FOURTH AMENDMENT VIOLATIONS

**Defendants: Berrien County, Benton Township, Michael DenDooven, John Visel, State of Michigan, William Ashley, Jeremiah Gauthier, and Shawn Yech, Mark Sanford, Steven Pierangeli**

(164)

Plaintiffs reallege paragraphs 1-164.

(165)

Pursuant to Berrien County's custom of racial animus and abuse of public offices and or state powers, the Defendants committed malicious prosecutions against the Plaintiffs Virece Berry and Charase Dorsey when they participated in, influenced, and or decided to attempt to prosecute the Plaintiffs without probable cause at the time of their filing charges.

(166)

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

(167)

"A malicious prosecution claim has four elements: "First, the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute. Second the plaintiff must show that there was a lack of probable cause for the criminal prosecution. Third, the plaintiff must show that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty, as understood in our Fourth Amendment jurisprudence, apart from

the initial seizure. Fourth, the criminal proceeding must have been resolved in the plaintiff's favor." *Bryant v. Macomb Cnty.*, 2:22-cv-12815, at *19-20 (E.D. Mich. Aug. 11, 2023).  Undisputed facts will show that the Plaintiffs satisfied all of the elements, as they were arrested, charged, and vindicated, after warrants were issued for their searches and seizures without probable cause and based on known fabricated allegations.

(168)

"Indeed, it is not surprising that rules of recovery for [infringement of a liberty interest in freedom from the initiation of a baseless prosecution] . . . have naturally coalesced under the Fourth Amendment, since the injuries usually occur only after an arrest or other Fourth Amendment seizure, an event that normally follows promptly . . . upon the formality of filing an indictment, information, or complaint. There is no restraint on movement until a seizure occurs or bond terms are imposed. Damage to reputation and all of its attendant harms also tend to show up after arrest. The defendant's mental anguish . . . customarily will not arise before an arrest, or at least before notification that an arrest warrant has been issued informs him of the charges.' *Ahlers v. Schebil*, 966 F. Supp. 518, 530 (E.D. Mich. 1997). Baseless prosecutions and the personal weaponization of state powers by

biased agents against Black American residents, as exemplified by these Plaintiffs and the Defendants, is an ongoing custom in Berrien County.

(169)

"The Fourth Amendment guarantees freedom from malicious prosecution. *France v. Lucas*, 836 F.3d 612, 625 (6th Cir. 2016); *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). "Malicious prosecution" encompasses wrongful investigation, prosecution, conviction, and incarceration. *France*, 836 F.3d at 639; *Sykes*, 625 F.3d at 308." *Hass v. Melrose Twp.*, No. 1:15-cv-675, at *9 (W.D. Mich. Jan. 23, 2017).  "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice. Buck v. Davis, 137 S. Ct. 759, 197 L. Ed. 2d 1 (2017).  These Plaintiffs, at the hands of the Defendants, have suffered wrongful, unsubstantiated investigations, arrest, and prosecutions.

(170)

Pursuant to Berrien County's custom of racial animus and abuse of public offices and or state powers, the Defendants committed malicious prosecutions against the Plaintiffs Virece Berry and Charase Dorsey when they participated in, influenced, and or decided to attempt to prosecute the

Plaintiffs without probable cause at the time of their filing charges.   The Plaintiffs were vindicated after long, arduous, and injurious defenses on facts and evidence that was in the possession of the Defendants at the initiation of the wrongful prosecutions pursued without probable cause.

(171)

## COUNT VIII. UNJUST ENRICHMENT: FOURTH AND FOURTEENTH AMENDMENT  VIOLATIONS

### Defendants: Berrien County, Continental Management, City of Benton Harbor

(172)

Plaintiffs reallege paragraphs 1-172.

(173)

The Defendants were unjustly enriched when they wrongfully extracted and retained court cost, fines, and fees from the Plaintiffs after they were vindicated and proven innocent from the Defendants' malicious prosecutions carried out without probable cause and pursuant to Berrien County's custom of racial animus and weaponization of state powers.  The Defendants City of Benton Harbor's public housing commission and  or Continental

Management LLC have been unjustly enriched by overcharging low income

housing program participant tenants like Raven Wright while providing

subpar housing conditions.

(174)

"For any state that recognizes the cause of action, the typical elements of a

state-law claim for unjust enrichment are: (1) the plaintiff conferred a benefit

upon the defendant; (2) the defendant accepted the benefit; and (3) injustice

would occur if the defendant did not pay the plaintiff for the value of the

benefit. Chapman v. Gen. Motors LLC, No. 219CV12333TGBDRG, 2021

WL 1286612 (E.D. Mich. Mar. 31, 2021). Even though no contract may

exist between two parties, under the equitable doctrine of unjust enrichment,

a person who has been unjustly enriched at the expense of another is

required to make restitution to the other. Morris Pumps v. Centerline Piping,

Inc., 273 Mich. App. 187, 729 N.W.2d 898 (2006).  The theory underlying

quantum meruit recovery is that the law will imply a contract in order to

prevent unjust enrichment when one party inequitably receives and retains a

benefit from another. Morris Pumps v. Centerline Piping, Inc., 273 Mich.

App. 187, 729 N.W.2d 898 (2006).

(175)

"[A]xiomatic and elementary," the presumption of innocence "lies at the foundation of our criminal law." *Coffin v. United States,* 156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481 (1895). Colorado may not retain funds taken from Nelson and Madden solely because of their now-invalidated convictions, see *supra,* at 1253 – 1254, and n. 3, for Colorado may not presume a person, adjudged guilty of no crime, nonetheless guilty *enough* for monetary exactions. Citing *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), Colorado asserts that "[t]he presumption of innocence applies only at criminal trials" and thus has no application here. Brief for Respondent 40, n. 19. Colorado misapprehends *Wolfish*. Our opinion in that case recognized that "under the Due Process Clause," a detainee who "has not been adjudged guilty of any crime" may not be punished. 441 U.S., at 535–536, 99 S.Ct. 1861 ; see *id.,* at 535–540, 99 S.Ct. 1861. *Wolfish* held only that the presumption does not prevent the government from "detain[ing a defendant] to ensure his presence at trial ... so long as [the] conditions and restrictions [of his detention] do not amount to punishment, or otherwise violate the Constitution." *Id.,* at 536–537, 99 S.Ct. 1861." *Nelson v. Colorado*, 137 S. Ct. 1249, 1256 (2017).  Despite the Plaintiffs being vindicated by the Defendants customarily dropping all charges against them on the days of their respective trials, the Defendant still

wrongfully retained the extracted fines paid during bail, bond, and house arrest on the charges initiated without probable cause and ultimately dropped, but only after the financial extraction and injury of the Plaintiffs.

(176)

The Defendant was unjustly enriched by the malicious prosecutions of the Plaintiffs when they extracted and retained bail, bond, and house arrest fees after the Plaintiffs were vindicated by the abandonment of the wrongful and fabricated charges lodged against them.  Berrien County has established and acted according to a custom of racial animus exemplified by their regular unjust enrichments from malicious prosecutions and coerced plea bargains to legally unsubstantiated charges.

(177)

**COUNT IX. CONSPIRACY TO VIOLATE CIVIL RIGHTS:**

**VIOLATIONS OF FIRST, FOURTH, AND FOURTEENTH**

**AMENDMENTS; 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 1985(3),**

**42 U.S.C. § 1986**

**ALL DEFENDANTS (Except Kevin Mackin)**

(178)

Plaintiffs reallege paragraphs 1-178.

(179)

The Defendants acted pursuant to Berrien County's custom of racial animus when they colluded in multiple plans to wrongfully arrest, detain, silence, and injure these Plaintiffs in contravention of their clearly established Constitutional rights.  Defendant Berrien County acted out a conspiracy to violate civil rights when they participated in a sex-favor scheme with inmates.

(180)

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.  "If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws,

or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws…or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. § 1985(3).  "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the

action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased." 42 U.S.C. § 1986.

(181)

"A civil conspiracy involves an agreement between two or more persons (or distinct legal entities) to injure another by unlawful action. *Hooks v. Hooks,*771 F.2d 935, 943-44 (6th Cir. 1985). To state a claim for a civil conspiracy to violate a right protected by § 1983 "[a]ll that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *Id.* at 944. The Sixth Circuit has clarified that an "[e]xpress agreement among all the conspirators is not necessary . . . Each conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Id. Seals v. Wayne Cnty.*, No. 20-11272, at *16-17 (E.D. Mich. Nov. 10, 2022). "The plaintiff must show that: (1) "a single plan" existed; (2) "the alleged

coconspirator shared in the general conspiratorial objective" to deprive the

plaintiff of a constitutional right (or a federal statutory right); and (3) "an

overt act was committed in furtherance of the conspiracy that caused injury"

to the plaintiff. *Id*. *Rudd v. City of Norton Shores*, 1:18-cv-124, at *1 (W.D.

Mich. Mar. 16, 2022).

(182)

"To maintain a cause of action for conspiracy under Section 1985(3), a

plaintiff must establish the following elements: (1) a conspiracy involving

two or more persons; (2) for the purpose of depriving, directly or indirectly,

a person or class of persons of the equal protection of the laws; (3) an act in

furtherance of the conspiracy; and (4) which causes injury to a person or

property, or a deprivation of any right or privilege of a citizen of the United

States." *Hall v. Bush*, 1:20-cv-731, at *26 (W.D. Mich. July 21, 2021).

(183)

The Defendant Berrien County, pursuant to its custom of racial animus and

abuse of state powers, used its Courts, Sheriffs, and Board to act out a

conspiratorial plan to underfund policing in Black American communities,

while habitually over charging, prosecuting, and coercing Black residents

into accepting unsubstantiated plea bargain convictions in violation of court

rules, ethics, and Constitutional rights, all to be unjustly enriched by racists custom of abusing State powers.  The Defendants collaborated and acted out plans to deny equal services like MDHHS's home care programs, wrongfully extracting child support payments by having satisfied accounts garnished without right, failing to send notice of Court hearings and wrongfully retaining fines for contempt of court charges, and further initiating charges and coercing plea bargains without probable cause.   The Defendants colluded and acted out searches and seizures without probable cause and conspired together to take steps to cover-up those wrongful actions with malicious prosecutions that ultimately failed due to their fraudulent foundations.

(184)

## COUNT X. GROSS NEGLIGENCE: HABITUAL FIRST, FOURTH, AND FOURTEENTH AMENDMENT VIOLATIONS, HABITUAL CONSPIRACIES TO VIOLATE CIVIL RIGHTS

## ALL DEFENDANTS

(185)

Plaintiffs reallege paragraphs 1-185.

(186)

As municipality entities, government agents, elected, appointed, and
certified professionals, the Defendants owed the Plaintiffs and the
community at large, a duty of standard of care and breached that standard
when they acted pursuant to Berrien County's custom of racial animus and
habitually denied the Plaintiffs equal access to services, regularly acted out
conspiracies to violate civil rights through retributive searches and seizures
without probable cause, and customarily abused Black residents in violation
of court rules, ethics, and Constitutional standards.

(187)

"No State shall make or enforce any law which shall abridge the privileges
or immunities of citizens of the United States; nor shall any State deprive
any person of life, liberty, or property, without due process of law; nor deny
to any person within its jurisdiction the equal protection of the laws." U.S.
Const. Amend. XIV.  "No person in the United States shall, on the ground of
race, color, or national origin, be excluded from participation in, be denied
the benefits of, or be subjected to discrimination under any program or
activity receiving Federal financial assistance." 42 U.S.C. § 2000d.  "All
persons shall be entitled to the full and equal enjoyment of the goods,
services, facilities, privileges, advantages, and accommodations of any place

of public accommodation, as defined in this section, without discrimination on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

(188)

"Gross negligence can be used to mean what it says — a high, though unspecified degree of negligence. Presumably this means conduct that is appreciably more risky, or less beneficial, than conduct qualifying as ordinary negligence. . . . The idea of reckless, willful or wanton misconduct is similar in that the risk-utility balance strongly disfavors the defendant's conduct — the risk was high, or very serious harm was threatened, or the cost of avoiding the danger was very low. . . . The defendant is guilty of reckless, willful or wanton misconduct only if he was conscious of the risk or had specific reason to know about it and proceeded without concern for the safety of others. . . . Although reckless, willful, or wanton misconduct is

not the same as intentional harm, in extreme cases courts may treat wanton misconduct more like an intentional tort than like negligence." *Lennon v. Metropolitan Life*, 504 F.3d 617, 621 (6th Cir. 2007).

(189)

The Defendants acted in gross negligence when they knowingly, willfully, and purposefully failed to perform the legal duty of care, i.e, maintain and perform County judicial and law enforcement functions without racial animus and in compliance with court rules and Constitutional protections. By habitually denying public services like adequate criminal defense, home care programs, unbiased policing, and committing false arrest, false imprisonments, cruel and unusual punishments, and malicious prosecutions, the Defendants each breached the respective standards of care owed to the Plaintiffs, thereby causing their deaths and sufferings.

(190)

## COUNT XI. CRUEL & UNUSUAL PUNISHMENT: VIOLATION OF THE EIGHTH AMENDMENT

### Defendants: Berrien County, Unknown Defendants

(191)

Plaintiffs reallege Paragraphs 1-191.

(192)

The Defendants committed cruel and unusual punishment when they caused Jasmine McCoy to be beaten, stripped naked, restrained, and denied food, water, and medical attention for several days.  The Defendants further inflicted cruel and unusual punishment when they were complicit with fourteen year old child R.R. being held in solitary confinement in Berrien County Jail for approximately two years.

(193)

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

(194)

"To state a claim under the Cruel and Unusual Punishments Clause, a party must prove not only that the challenged conduct was both cruel and unusual, but also that it constitutes *punishment*. " *Helling v. McKinney*, 509 U.S. 25, 42 (1993).  "Then, too, a cruelly disproportionate relation between what the law requires and the sanction for its disobedience may constitute a violation of the Eighth Amendment as a cruel and unusual punishment, and, in respect to the States, even offend the Due Process Clause of the Fourteenth Amendment." *Lambert v. California*, 355 U.S. 225, 231 (1957).

(195)

"The Eighth Amendment prohibits "cruel and unusual punishment." U.S. Const. amend. VIII. This protection applies not only to the terms of a convicted defendants' sentence, but also to the "conditions under which" a prisoner "is confined." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). Indeed, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being." *Wilson v. Williams*, 961 F.3d 829, 839 (6th Cir. 2020); *see also DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 199-200. Thus, the state has a duty to provide for the prisoner's "basic human needs," including "food, clothing, shelter, medical care, and reasonable safety." *Deshaney*, 489 U.S. at 200. An official violates the Eighth Amendment where he or she acts with "'deliberate indifference' to an inmate's 'serious medical needs.'" *Plair v. Holmes*, No. 1:19-cv-815, 2020 WL 8187989, at *5 (W.D. Mich. Dec. 29, 2020) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976)). To establish that prison officials violated the Eighth Amendment by denying medical care, the inmate must show (1) that he or she was deprived of an objectively serious medical need, and (2) that the defendant knew "of and disregarded] an excessive risk to [his or her] health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Rhinehart v. Scutt*, 894 F.3d 721, 737-38, (6th Cir.

2018). *West v. Jindall*, 2:21-cv-10225, at *18-19 (E.D. Mich. Apr. 18, 2023). The Plaintiffs assert that a fourteen year old being held in solitary confinement in an adult jail for two years equates to torturous, barbaric treatment and that the denial of regular human contact and communication is a denial of an imperative mental health medical need, and that the Defendants were complicit and indifferent to definite injuries from the said punishment.

(196)

The Defendants committed cruel and unusual punishment when they caused and were complicit with fourteen year old child R.R. being held in solitary confinement in Berrien County Jail for approximately two years without regular human contact, communication, or mental health treatments.  The Defendants committed cruel and unusual punishment when they attacked, stripped naked, restricted, and starved Jasmine McCoy for several days in the "hole" solitary confinement space while subjecting her to boasts about sleeping with other female inmates.

(197)

## COUNT XII. MALPRACTICE: VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS

**Defendants: Berrien County, Kevin Mackin, Caleb Grimes**

(198)

Plaintiffs reallege paragraphs 1-198.

(199)

The Defendants committed malpractice when they acted according to Berrien County's custom of racial animus and negligently directed Virece Berry to withhold payments for his tether ankle house arrest monitor, failed to inform him of a court hearing, and caused him to be held in contempt of court and detained until his house arrest fees were paid in full.  Caleb Grimes committed malpractice when he failed to file Plaintiff Temesia Davis's motion to withdraw her plea six weeks after she requested it and participated in extra judicial communications with Berrien County Judge Pasula without his client's consent.

(200)

"In all criminal prosecutions,the accused shall enjoy the right to a speedy and public trial,by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the

Assistance of Counsel for his defense." U.S. Const. amend. VI.  "Nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

(201)

"In Michigan, the elements of a legal malpractice claim are (1) the existence of an attorney-client relationship, (2) negligence in the legal representation of the plaintiff, (3) the negligence proximately caused the plaintiff's injury, and (4) the fact and extent of the injury alleged." Charles Reinhart Co. v. Winiemko,444 Mich. 579, 585-86 (1994). *ADAMASU v. GIFFORD, KRASS, GROH, SPRINKLE*, 409 F. Supp. 2d 788, 792 (E.D. Mich. 2005).  Plaintiffs Temesia Davis and Virece Berry were clients of Caleb Grimes, Kevin Mackin and the Berrien County Prosecutor's Office when Caleb Grimes failed to file an emergency motion for six weeks and Attorney Mackin instructed Virece Berry to withhold tether house arrest payments, failed to inform him of his following court hearing, and caused him to be arrested and held in the Berrien County Jail until he could pay fees and costs in full. Attorney Grimes, for his part, in failing to file her emergency motion to withdraw her plea, exposed Temesia Davis to conviction on a fraudulent,

coerced plea bargain, colluded with Judge Pasula in extra-judicial communications without Ms. Davis's knowledge, and was complicit in Assistant Berrien County Prosecutor Taylor Koch calling her job and detrimentally interfering with her work contract and getting her terminated.

(202)

The Defendant Caleb Grimes committed legal malpractice and gross negligence when he obtained a plea bargain acceptance from a heavily medicated client just removed from a serious surgery, then failed to file an emergency motion to withdraw a plea bargain, and participated in extra-judicial communication without his clients knowledge. Defendants Berrien County and Kevin Mackin committed malpractice when he instructed Virece Berry to withhold tether house arrest payments, failed to inform him of his following court hearing, and caused him to be arrested and held in the Berrien County Jail until he could pay fees and costs in full. The Defendants further committed malpractice in contravention of the due process equal protection clause and the Plaintiff's right to adequate legal representation when they banned him from the Public Defender's Office for expressing complaints about his representation and consequential sufferings.

(203)

140

## COUNT XIII. DISABILITY DISCRIMINATION: VIOLATION OF 29

## U.S.C. § 794 & 42 U.S.C. § 12132

## Defendants: Berrien County, State of Michigan, MDHHS, Unknown

## Defendants

(204)

Plaintiffs reallege paragraphs 1-204.

(205)

The State Defendants violated the American Disabilities Act when they denied Karl Cotton home care services owner and operator status because he was disabled, denied him disabled person accommodations by failing to provide paper versions of all correspondence.  The County Defendants violated the ADA when they beat, stripped, and starved Jasmine McCoy for three days in a retaliatory response to a mental health episode in which she threatened suicide for attention.  The County Defendant also violated the ADA when they failed to provide R.R. with adequate mental health services while confining him in solitary confinement for approximately a year or more.

(206)

"Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation

in or be denied the benefits of the services, programs, or activities of a

public entity, or be subjected to discrimination by any such entity." 42

U.S.C. § 12132.  "No otherwise qualified individual with a disability in the

United States, as defined in section 705(20) of this title, shall, solely by

reason of her or his disability, be excluded from the participation in, be

denied the benefits of, or be subjected to discrimination under any program

or activity receiving Federal financial assistance." 29 U.S.C. § 794.  "A State

shall not be immune under the eleventh amendment to the Constitution of

the United States from an action in 1 Federal or State court of competent

jurisdiction for a violation of this chapter. In any action against a State for a

violation of the requirements of this chapter, remedies (including remedies

both at law and in equity) are available for such a violation to the same

extent as such remedies are available for such a violation in an action against

any public or private entity other than a State. 42 U.S.C. § 12202.

(207)

"By separately identifying as requirements of public entities that they not

deny qualified disabled individuals the benefits of public services and that

they not discriminate against such individuals, the provision demands more

of public entities than simply refraining from intentionally discriminating

against disabled individuals. *See Henrietta D. v. Bloomberg,* 331 F.3d 261,

276 (2d Cir. 2003) ("A plaintiff can prevail [under § 202, 42 U.S.C. 12132]
either by showing `discrimination' or by showing `deni[al of] the benefits' of
public services.") (quoting 42 U.S.C. § 12132); *see also Olmstead,* 527 U.S.
at 600, 119 S.Ct. 2176 (stating that, with § 202, "Congress not only required
all public entities to refrain from discrimination"). In stating that public
entities shall not deny qualified disabled individuals the benefits of public
services, § 202 necessarily requires that public entities provide such
individuals the means necessary to acquire access to these services. *Ability
Center, Toledo v. City of Sandusky*, 385 F.3d 901, 909-10 (6th Cir. 2004).

(208)

"Accordingly, a plaintiff seeking to state a claim under either the ADA or §
504 against a school receiving federal financial assistance must show that he
or she is (1) disabled under the statute, (2) "otherwise qualified" for
participation in the program, and (3) being excluded from participation in,
denied the benefits of, or subjected to discrimination under the program by
reason of his or her disability. *Maddox*, 62 F.3d at 846. The discrimination
requirement is rooted in two parts of the statute's text: plaintiffs must prove
that they have either been subjected to discrimination or excluded from a
program or denied benefits solely by reason of their disability. *S.S. v. E. Ky.*

*Univ.*, 532 F.3d 445, 453 (6th Cir. 2008).  "The Court has recognized that §

202 of Title II, 42 U.S.C. § 12132, is enforceable through a private cause of

action. *Barnes v. Gorman,* 536 U.S. 181, 184-85, 122 S.Ct. 2097, 153

L.Ed.2d 230 (2002)" *Ability Center, Toledo v. City of Sandusky*, 385 F.3d

901, 906 (6th Cir. 2004).

(209)

"In *Georgia*, an inmate alleged that certain conduct by prison officials

independently violated his Eighth Amendment rights and Title II of the

ADA. 546 U.S. at 157, 126 S.Ct. 877. Without deciding the accuracy of

those allegations, the Court explained that the inmate's "claims for money

damages against the State under Title II were evidently based . . . on conduct

that independently violated the provisions of § 1 of the Fourteenth

Amendment" because the guarantee against cruel and unusual punishment

has been incorporated into the Due Process Clause of the Fourteenth

Amendment. *Id.* As such, the plaintiff in *Georgia* "differ[ed] from the

claimants in our other cases addressing Congress's ability to abrogate [state]

sovereign immunity. . . ." *Id.* (citing *Tennessee v. Lane*, 541 U.S. 509, 543 n.

4, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) and *Bd. of Trustees of Univ. of

Ala. v. Garrett*, 531 U.S. 356, 362, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001)).

Thus, the Court held that "insofar as Title II creates a private cause of action

for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Id.* at 159, 126 S.Ct. 877." *Mingus v. Butler*, 591 F.3d 474, 482 (6th Cir. 2010).

(210)

The State Defendants acted pursuant to Berrien County's custom of racial animus and violated the American Disabilities Act when they denied Karl Cotton home care services owner and operator status, full pay for his employees, and denied him disabled person accommodations by failing to provide paper versions of all correspondence.  The County Defendants acted pursuant to their custom of racial animus and violated the ADA when they beat, struck, kicked, Jasmine McCoy, repeatedly smashing her head on the concrete,  before stripping, restricting,  and starving her for three days in solitary confinement all in a retaliatory response to the Plaintiff's mental health episode outburst in which she threatened her own suicide to force the deputies to pay attention to her calls.

(211)

## COUNT XIV. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**Defendants: Berrien County, Steven Pierangeli, Mark Sanford, Taylor Koch, Leonard Bailey, William Ashley, Jeremiah Gauthier, Rebecca Wright, John Visel, Daniel McGinnis, Jonathan Bowman, Jacob Will, Continental Management LLC., Steve Cook, and Unknown Defendants**

(212)

Plaintiffs reallege paragraphs 1-212.

(213)

The Defendants subjected the Plaintiffs to intentional infliction of emotional distress when they collaborated to initiate long and injurious malicious prosecutions against Charase Dorsey and Virece Berry.  The Plaintiffs further inflicted severe emotional distress when they bragged about sleeping with female inmates before and after beating, stripping, and starving Jasmine McCoy.  Defendant McGinnis acted egregiously when he repeatedly made unnecessary contact with Plaintiff Ieshia Blackwell at place of work and had her home, family, and friends surveilled and harassed, in an attempt to inflame her PTSD and mental health issues and in retribution for filing suit against him.

(214)

"To establish a claim of intentional infliction of emotional distress, a plaintiff must prove the following elements: (1) extreme and outrageous

conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. Hayley v. Allstate Ins. Co., 262 Mich. App. 571, 686 N.W.2d 273 (2004).  "The conduct complained of in a suit alleging intentional infliction of emotional distress must be so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Hayley v. Allstate Ins. Co., 262 Mich. App. 571, 686 N.W.2d 273 (2004).  "Sufficient proof must be adduced of intentional infliction and something much more than simply aggravation must be shown to make out a case of intentional infliction of emotional distress under Michigan law; this requires plaintiff to show more than hurt feelings, but seeking and receiving medical treatment is not a condition precedent to satisfying the element of extreme emotional distress". Gilliam v. Ordiway, 147 F. Supp. 3d 664 (E.D. Mich. 2015).

(215)

The Defendants exhibited extreme and outrageous conduct when they collaborated to initiate long and injurious malicious prosecutions against Charase Dorsey and Virece Berry, bragged about sleeping with female inmates before and after beating, stripping, and starving Jasmine McCoy, and repeatedly made unnecessary contact with Plaintiff Ieshia Blackwell at place of work, had her home, in an attempt to inflame her PTSD and mental

health issues in retribution for filing suit against him.  The actions of the Defendant have caused the Plaintiff severe mental and emotional anguish. As such, the Plaintiff is entitled to compensation and equitable relief to be made as whole as possible for injuries.

(216)

## COUNT XV. ASSAULT & BATTERY

## Defendants: Berrien County, William Ashley, Jeremiah Gauthier, John Visel, Steve Cook, and Unknown Defendants

(217)

Plaintiffs reallege paragraphs 1-217.

(218)

The Defendants committed assault and battery when they intentionally forced their way into the Plaintiff's home, pointing guns at her, handcuffed her, and forced her out of and back into her home at gunpoint, thereby harming the plaintiff physically and mentally.  The Defendants further subjected the Plaintiff to a malicious prosecution, during which she suffered a heart attack.  Defendant Visel assaulted and battered the Plaintiff Virece Berry when he caused him to be seized and detained without probable cause. Unknown defendants attacked, beat, stripped, restricted, and starved Jasmine McCoy for three days, equating to assault and battery.

(219)

"Assault" is defined as either an attempt to commit a battery or an unlawful act that places another in reasonable apprehension of receiving an immediate battery. People v. Meissner, 294 Mich. App. 438, 812 N.W.2d 37 (2011). "Battery" is an intentional, unconsented and harmful or offensive touching of the person of another. People v. Meissner, 294 Mich. App. 438, 812 N.W.2d 37 (2011).  "A "battery" is an intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person; it is not necessary that the touching cause an injury. Lakin v. Rund, 318 Mich. App. 127, 896 N.W.2d 76 (2016). "Common-law battery does not require force capable of causing physical pain or injury." Stokeling v. United States, 139 S. Ct. 544, 202 L. Ed. 2d 512 (2019).

(220)

Michigan law defines "serious impairment of body function" as such: "an impairment affects a person's general ability to lead his or her normal life where the impairment "influence[s] some of the person's power or skill, i.e., the person's capacity to lead a normal life." *Patrick v. Turkelson*, 919 N.W.2d 280(Mem) (Mich. 2018).  Plaintiff Charase Dorsey is suffering from post traumatic stress disorder as a result of the reckless and wanton use of

firearms pointed towards her head and the heart attack she suffered as a result of the malicious prosecution initiated against her, forever impairing her ability to lead a "normal life." *Patrick v. Turkelson*, 919 N.W.2d 280(Mem) (Mich. 2018).  Plaintiff Virece Berry was assaulted and battered twice when he was initially arrested and detained without probable cause and later rearrested on contempt of court charges stemming from the Berrien County's Court's failure to send notice to the proper address.  Plaintiff Jasmine McCoy suffered a vicious assault and battery when she had her head banged against the Berrien County jail's concrete floors by guards who repeatedly punched and kicked her before stripping her naked, restricting her, and starving her for three days in solitary confinement.

(221)

## COUNT XVI. VIOLATION OF THE FAIR HOUSING ACT: 42 U.S.C. § 3604, 42 U.S.C. § 3608(e)(5), 42 U.S.C. § 1404a,

**Defendants: Berrien County, HUD Secretary Marcia L. Fudge, Department of Housing and Urban Development, City of Benton Harbor, Continental Management, Steve Cook, and Unknown Defendants**

(222)

Plaintiffs reallege paragraphs 1-222.

(223)

The Defendants violated the FHA when they habitually subjected the Plaintiffs to subpar housing like broken doors, elevators, floods, and malfunctioning electrical wiring, while subjecting them to discriminatory acts to suppress their complaints like violent verbal threats of evictions and organizing attacks on their homes.

(224)

"As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful- … (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b).  "(e) Functions of Secretary: The Secretary of Housing and Urban Development shall- … (3) cooperate with and render technical assistance to Federal, State, local, and other public or private agencies, organizations, and institutions which are formulating or carrying on programs to prevent or eliminate discriminatory housing practices; (4) cooperate with and render such technical and other assistance

to the Community Relations Service as may be appropriate to further its
activities in preventing or eliminating discriminatory housing practices; (5)
*administer the programs and activities relating to housing and urban
development in a manner affirmatively to further the policies of this
subchapter"* 42 U.S.C. § 3608(e)(5).

(225)

"A violation of the Fair Housing Act can be shown either by proof of
discriminatory animus or by proof of disparate impact or effect. *See
Inclusive Cmtys. Project, Inc. v. Tex. Dept. of Hous. and Cmty. Affairs* , 747
F.3d 275, 280 (5th Cir. 2014). The existence of economic (or religious or
moral) motivations does not protect the defendants from housing
discrimination claims when their actions had a clear discriminatory effect."
*Linkletter v. W. & S. Fin. Grp., Inc.*, 851 F.3d 632, 640 (6th Cir. 2017).

(226)

The FHA permits "[a]n aggrieved person" to file a civil action to seek
redress, 42 U.S.C. § 3613(a)(1)(A), and defines "aggrieved person" to
include any person who "claims to have been injured by a discriminatory
housing practice," § 3602(i)(1). Recovery under the FHA is not limited to
"persons who are directly and immediately subjected to discrimination."

*Hamad v. Woodcrest Condo. Ass'n,* 328 F.3d 224, 231 (6th Cir.2003).

Congress intended standing under the FHA to extend to the "full limits" of

Article III of the United States Constitution, and accordingly an FHA

plaintiff need only allege a "distinct and palpable injury" caused by the

defendant's actions. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102

S.Ct. 1114, 71 L.Ed.2d 214 (1982) (internal quotation marks omitted); *see

also Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.,* 725 F.3d 571, 576

(6th Cir.2013). *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531,

544 (6th Cir. 2014).  "This court has stated that private enforcement of the

Fair Housing Act "not only vindicates the civil rights of the individual

victim of discrimination, but promotes the public interest by eradicating

housing discrimination. The eradication of housing discrimination is a policy

that Congress considered to be of the highest priority." *Price v. Pelka,* 690

F.2d 98, 101 (6th Cir. 1982). *Foster v. Barilow*, 6 F.3d 405, 409 (6th Cir.

1993).

(227)

"The United States Housing Act of 1937, 42 U.S.C. § 1404a, provides that

the United States Housing Authority may "sue and be sued" with respect to

its functions under this chapter. While the Court in *A.L. Brown Son v.*

*Department of Housing and Urban Development,* 611 F.2d 997, 1000 (5th Cir. 1980), expressed uncertainty as to whether or not section 1404a waives sovereign immunity, the prevailing view is that it does. *See Portsmouth Redevelopment Housing Authority v. Pierce,* 706 F.2d 471, 475 (4th Cir. 1983); *United States v. Adams,* 634 F.2d 1261, 1265 (10th Cir. 1980); *Jemo Associates, Inc., v. Greene Metropolitan Housing Authority,* 523 F. Supp. 186, 187 (S.D.Ohio 1981); *Ippolito- Lutz, Inc. v. Harris,* 473 F. Supp. 255, 259 (S.D.N.Y. 1979)." *Tempo, Inc. v. City of Gladstone Housing*, 635 F. Supp. 879, 881 (W.D. Mich. 1984).

(228)

The Defendants violated the Fair Housing Act and its subsequent regulations when they subjected Danielle Washington, Raven J. Wright, and others similarly situated to habitual customs of racial animus substantiated by racists tropes, violent threats of evictions in response to complaints about floods, flood damage, electrical problems, broken elevators, security issues, bug infestations, and other issues of habitability.

(229)

## COUNT XVII. HABITUAL VIOLATIONS OF THE UNITED STATES HOUSING ACT OF 1937 (WAGNER-STEAGALL ACT) AND

**FEDERAL HOUSING REGULATIONS: 42 U.S.C. § 1437f ; 24 C.F.R. § 5.703 ; 24 C.F.R. § 92.209 ; and 24 C.F.R. § 92.504**

**Defendants: Berrien County, HUD Secretary Marcia L. Fudge, Department of Housing and Urban Development, City of Benton Harbor, Continental Management LLC., and Steve Cook**

(230)

Plaintiffs reallege paragraphs 1-230.

(231)

The Defendants violated the Wagner Steagall Act and subsequent federal regulations when they habitually subjected tenants Danielle Washington, Raven Wright and others similarly situated to inhumane and subpar housing quality beneath federally prescribed standards while regularly failing to adequately inspect and remediate housing quality issues.

(232)

"Every contract for contributions shall provide that - (2) The public housing agency shall determine, and so certify to the Secretary, that each family in the project was admitted in accordance with duly adopted regulations and approved income limits; and the public housing agency shall review the

incomes of families living in the project no less frequently than annually" 42

U.S.C. § 1437d(c)(2).    "(4) the public housing agency shall comply with

such procedures and requirements as the Secretary may prescribe to assure

that sound management practices will be followed in the operation of the

project, including requirements pertaining to - (C) the establishment of

effective tenant-management relationships designed to assure that

satisfactory standards of tenant security and project maintenance are

formulated and that the public housing agency (together with tenant councils

where they exist) enforces those standards fully and effectively;" 42 U.S.C.

§ 1437d(c)(4)(C).

(233)

"(f) Housing quality requirements - (1) In general: Each contract for

contributions for a public housing agency shall require that the agency

maintain its public housing in a condition that complies with standards

which meet or exceed the housing quality standards established under

paragraph (2). (2) Federal standards: The Secretary shall establish housing

quality standards under this paragraph that ensure that public housing

dwelling units are safe and habitable. Such standards shall include

requirements relating to habitability, including maintenance, health and

sanitation factors, condition, and construction of dwellings, and shall, to the greatest extent practicable, be consistent with the standards established under section 1437f(o)(8)(B)(i) of this title. The Secretary may determine whether the laws, regulations, standards, or codes of any State or local jurisdiction meet or exceed these standards, for purposes of this subsection. (3) Annual inspections: Each public housing agency that owns or operates public housing shall make an annual inspection of each public housing project to determine whether units in the project are maintained in accordance with the requirements under paragraph (1). The agency shall retain the results of such inspections and, upon the request of the Secretary, the Inspector General for the Department of Housing and Urban Development, or any auditor conducting an audit under section 1437c(h) of this title, shall make such results available. 42 U.S.C. § 1437d(f)(2).

(234)

"(B) Housing quality standards: The housing quality standards under this subparagraph are standards for safe and habitable housing established- (i) by the Secretary for purposes of this subsection; or(ii) by local housing codes or by codes adopted by public housing agencies that - (I) meet or exceed housing quality standards, except that the Secretary may waive the

requirement under this subclause to significantly increase access to affordable housing and to expand housing opportunities for families assisted under this subsection, except where such waiver could adversely affect the health or safety of families assisted under this subsection; and (II) do not severely restrict housing choice. (C) Inspection: The determination required under subparagraph (A) shall be made by the public housing agency (or other entity, as provided in paragraph (11)) pursuant to an inspection of the dwelling unit conducted before any assistance payment is made for the unit. Inspections of dwelling units under this subparagraph shall be made before the expiration of the 15-day period beginning upon a request by the resident or landlord to the public housing agency or, in the case of any public housing agency that provides assistance under this subsection on behalf of more than 1250 families, before the expiration of a reasonable period beginning upon such request. The performance of the agency in meeting the 15-day inspection deadline shall be taken into consideration in assessing the performance of the agency. 42 U.S.C. § 1437f(o)(8)(B)(i)-(C).

(235)

"(D) Biennial inspections - (i) Requirement: Each public housing agency providing assistance under this subsection (or other entity, as provided in

paragraph (11)) shall, for each assisted dwelling unit, make inspections not less often than biennially during the term of the housing assistance payments contract for the unit to determine whether the unit is maintained in accordance with the requirements under subparagraph (A). (ii) Use of alternative inspection method. The requirements under clause (i) may be complied with by use of inspections that qualify as an alternative inspection method pursuant to subparagraph (E).  (iii) Records - The public housing agency (or other entity) shall retain the records of the inspection for a reasonable time, as determined by the Secretary, and shall make the records available upon request to the Secretary, the Inspector General for the Department of Housing and Urban Development, and any auditor conducting an audit under section 1437c(h) of this title." 42 U.S.C. § 1437f(o)(8)(D).

(236)

"(i)  *Housing standards.* Housing occupied by a family receiving tenant-based rental assistance under this section must meet the participating jurisdiction's property standards under § 92.251. The participating jurisdiction must inspect the housing initially and re-inspect it annually." 24 C.F.R. § 92.209.  "*Health and safety concerns -*  (1)*General.* The inside,

outside and unit must be free of health and safety hazards that pose a danger

to residents. Types of health and safety concerns include, but are not limited

to carbon monoxide, electrical hazards, extreme temperature, flammable

materials or other fire hazards, garbage and debris, handrail hazards,

infestation, lead-based paint, mold, and structural soundness." 24 C.F.R. §

5.703(e).   "The HOME-assisted project and units will be decent, safe,

sanitary, and in good repair. This means that the HOME-assisted project and

units will meet the standards in 24 CFR 5.703" 24 C.F.R. §

92.251(b)(1)(viii)

(237)

"The Sixth Circuit recognizes that federal regulations alone may create

enforceable rights under § 1983. *Loschiavo,*33 F.3d at 551; *Bosscher,* 246 F.

Supp.2d at 797."*Johnson v. City of Detroit*, 319 F. Supp. 2d 756, 771 (E.D.

Mich. 2004).   Another section of the USHA,... requires that each annual

contributions contract for a PHA shall require that the agency maintain its

public housing in a condition that complies with certain housing quality

standards that ensure that the public housing is "safe and habitable." *Id.* §

1437d(f)(2). *Johnson v. City of Detroit*, 446 F.3d 614, 626 (6th Cir. 2006).

(238)

The Defendants violated their non-discretionary duties under the Wagner Steagall Act and subsequent USHA federal regulations when they habitually subjected tenants like Danielle Washington, Raven Wright, and others similarly situated to floods, security issues, broken elevators, electrical problems, and other subpar housing issues, causing Berrien County's low-income and subsidized housing programs to fall beneath the federally prescribed quality standards.  The Defendants further violated the WSA and USHA by regularly failing to adequately inspect and remediate housing quality issues in Berrien County's Black Communities.

(239)

**POLICY ISSUE:** *FEDERAL AGENCIES' AND THE STATE OF MICHIGAN'S COMPLICITY AND COLLUSION WITH THE COUNTY OF BERRIEN'S CUSTOMARY VIOLATIONS OF THE U.S. CONSTITUTION*

Plaintiffs reallege paragraphs 1-239.

(240)

For several decades, Defendants Berrien County, the State of Michigan, and if former police officer Andrew Collins is to be taken at his word, even federal entities, and their agents in Michigan have been aware, complicit,

and participating in an on-going ingrained custom of racial animus and deliberate violations of the Constitutional rights and protections of Black American residents in Berrien County.  This participation and complicity with decades of conspiracies against citizen rights, intentional discriminations in the administration of justice, and disparate treatment in access to, and performance of government services has been the foundation of riots in Berrien County and across the nation, leading to the destruction of property, suspensions of commerce, and a proliferation in domestic anti-government activity and societal hatred for law enforcement.

(241)

Since Berrien County's 2003 Benton Harbor riots and the days of Andrew Collins, Bernard Hall, and their colleagues being exposed as collaborating cogs in a scheme to plant narcotics on residents, falsify court documents, and knowingly participate in fraudulent, malicious prosecutions, the Defendant State of Michigan has been aware of and complicit with Berrien County's egregious custom of racial animus based malicious prosecution and biased administration of state governmental powers and programs.  After close to twenty years later, the Michigan Judicial Tenure Commission again noted the habitual custom of racial animus and highlighted that for over the

course of a decade Judge Lasata violated Michigan's code of judicial conduct and failed to comply with court rules."  The article goes on to note: "LaSata, the commission review found in its review, "disparaged criminal defendants in personal terms," required cash bonds in cases when a court rule required releasing defendant's pretrial on personal recognizance, and he improperly ordered defendants incarcerated for failing to pay fines and fees." (See Exhibit F, Judge Lasata Admonishment Article).   Defendant State of Michigan has habitually failed to address these incidents which are not isolated to one judge in a single courtroom, but is clearly indicative of an ingrained custom in the county emanating from the Berrien County Courthouse and law enforcement departments.   These entities, due to immunity protections, violate the federal and state constitutions habitually without accountability compensation, or reparation for their victims.  While it may, or may not be within its purpose or powers, the Michigan Judicial Tenure Commission admonishment utterly fails to address the injuries incurred by those citizens subjected to the actions they highlighted.

(242)

The ripple effects of Berrien County's custom of racial animus on the judicial benches of the County and other public offices not only injured the

Plaintiffs before the Court, but the entire Berrien County community.  In the course of the malicious prosecution against her, Charase Dorsey lost her child care license as a result of the search and seizure at her home that was initiated without probable cause.  By causing her to lose her childcare license, the Defendants removed one of the few licensed child care providers in the community, further depressing the child care market in Berrien County's Black American community and immediately disrupting the lives of several African American families who depended on her professional services.  Temesia Davis, a licensed medical professional, was removed from a healthcare industry that suffers from under-representation and racial disparities after being coerced into a plea bargain while being heavily medicated and just out of surgery, accepting a charge for the "wrongful" possession of her own legally registered weapon.  Injuries like these endured by these Plaintiffs have been sustained on a regular basis for decades and generally serve to make life harder for all Black American residents in the County, all of whom suffer the ripple effects and lowered quality of life produced by Berrien County's custom of racial animus.

(243)

While Defendant State of Michigan's Judicial Tenure Commission claims to see a change in Judge Lasata's behavior, these Plaintiffs and the actions taken against them prove that there has not been a change in the general custom or pattern of constitutional abuses in Berrien County courts.  Judge Lasata officiated the long and unsubstantiated malicious prosecution of Virece Berry, subjecting him to unwarranted house arrest, unreasonably high fines, and jailing him on contempt of Court for failing to appear to a hearing after the Berrien County court sent his hearing notice to the wrong address; an address which has never been associated with Mr. Berry.  Despite the State of Michigan's claims, Judge Lasata continues to serve as a mechanism for constitutional violations.  After all charges were dismissed in his Court, he failed to return the unreasonably high fees and costs he extracted from Mr. Berry.  While Plaintiff Charase Dorsey endured prosecution for legally impossible charges in Judge Pasula's court, she lost her professional child care license, access to MDHHS government services, and was denied job offers due to the pending fraudulent charges.  Judge Pasuala turned a blind eye to the fact that a felon in possession of ammunition charge cannot be sustained by a felony from 1994 and that the felony must be from within three years of the possession of ammunition.  Judge Pasula, along with the Berrien County Prosecutor's Office, all knew that the charge lodged against

Mrs. Dorsey was implausible, yet she allowed prosecutors in her court to pursue an obvious and clear malicious prosecution in an aggressive pursuit to attain a miscarriage of justice. "The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. See *Carey v. Piphus*, 435 U.S. 247, 259–262, 266–267, 98 S.Ct. 1042, 1043, 1050–1052, 1053, 1054, 55 L.Ed.2d 252, (1978).   "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice. Buck v. Davis, 137 S. Ct. 759, 197 L. Ed. 2d 1 (2017).  By establishing, maintaining, and operating pursuant to an ingrained and traditional custom of racial animus against Black Americans, and doing so while enjoying and benefiting from the State of Michigan's complicity, the Defendants have violated the Supremacy Clause of the U.S. Constitution and International Covenants ratified pursuant to it by the U.S. Senate.

(244)

The Supremacy Clause affirms: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and *all Treaties made*, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the

Contrary notwithstanding." U.S. Const. art. VI, cl. 2.  Article 6 of the ratified Convention mandates that: "States Parties shall assure to everyone within their jurisdiction effective protection and remedies, through the competent national tribunals and other State institutions, against any acts of racial discrimination which violate his human rights and fundamental freedoms contrary to this Convention, as well as the right to seek from such tribunals just and adequate reparation or satisfaction for any damage suffered as a result of such discrimination." U.S. Const. art. VI, cl. 2., *International Convention on the Elimination of All Forms of Racial Discrimination art.6,* Dec.21, 1965, Ratified October 8, 1994.  In addition to the laws cited in the claims and factual background for each plaintiff, the Defendants are also in violation of the highest laws of the land by establishing, maintaining, and acting pursuant to a custom of racial animus.  Furthermore, Plaintiffs invoke the above-mentioned Supremacy Clause and ratified covenants as protections from any and all assertions of immunity in contravention of these Plaintiffs rights to adjudication of their claims on the merits in an unbiased and disinterested tribunal, i.e., the Federal District Courts.

(245)

The custom of racial animus and discriminatory abuses of State powers in Berrien County, acted out by all levels of government agents, public

officials, and officers in the County, has caused and contributed innumerable tortious injuries among its minority residents.  Decades of abuses of power, malicious prosecutions, violations of court rules, and judicial ethics, has eroded the public's faith in law enforcement and the courts.  The role of County agents and their collaborators in vindictive conspiracies to violate the human rights of citizens has further contributed to a state of lawlessness and descent into vigilante justice, endangering all Berrien County residents, law enforcers, and officers of the courts.

(246)

**DAMAGES**

(247)

Plaintiffs reallege paragraphs 1-247.

(248)

"If a court finds that a plaintiff was wrongfully convicted and imprisoned, the court shall award compensation as follows: (a) Fifty thousand dollars for each year from the date the plaintiff was imprisoned until the date the plaintiff was released from prison, regardless of whether the plaintiff was released from imprisonment on parole or because the maximum sentence was served. For incarceration of less than a year in prison, this amount is

prorated to 1/365 of $50,000.00 for every day the plaintiff was incarcerated in prison. Mich. Comp. Laws § 691.1755.  This equates to approximately one hundred and thirty-seven dollars ($137) per day of wrongful confinement.  A "jury may be permitted to assess punitive damages in an action under § 1983 when a defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to federally-protected rights of others and such threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness. 42 U.S.C.A. § 1983. <u>Smith v. Wade</u>, 461 U.S. 30, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983).

(249)

**RELIEF REQUESTED**

(250)

Plaintiffs reallege paragraphs 1-250.

(251)

As a result of the aforementioned legal violations suffered by the Plaintiffs and caused by the Defendants, these Plaintiffs are enduring loss of funds, deteriorating health, anxiety disorders, phobias, mental anguish, outrage, loss of sleep, and severe emotional distress.

(252)

**Wherefore**, the Plaintiff respectfully requests that this Honorable Court enter a Judgment in her favor against Defendants for the following relief:

I.   An order declaring Berrien County's custom of racial animus as unconstitutional.

II.   That $35,000,000.00 be paid in compensatory, derivative, hedonic, and exemplary damages to the Plaintiffs to compensate them for their loss of funds, mental and emotional anguish, and the deterioration of health they will continue to endure; and also to ensure that other similarly situated communities do not suffer a similar harms and or wrongful acts.

III.   That $300,000.00 be paid as an award of interest, costs, and reasonable attorney fees;

IV.   Any other compensatory, derivative, hedonic, exemplary, or equitable relief that this Honorable Court deems appropriate at the commencement of trial.

**THE J.R. BEASON FIRM, PLLC.**
Attorney John R. Beason III
for the Plaintiffs

Dated: January 29th, 2024                By:  /s/ John R. Beason III, Esq.
                                         The J.R. Beason Firm PLLC.
                                         D.C. Bar No.: 1721583

IBA Bar No.: 1522438
853 McAlister St.
Benton Harbor, MI 49022
(269) 213-1426
JRBeason3@TheJRBeasonFirm.com

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MELVIN DAVIS, ET AL.

      Plaintiff,

                              Case No.:

                              Honorable Chief Judge Yarbou
                              Honorable Magistrate:

          v.

COUNTY OF BERRIEN,
 ET AL.

      Defendants.

_____/

## DEMAND FOR JURY TRIAL

      Plaintiffs respectfully demand a trial by jury as to all issues triable as a matter of right.

                              Respectfully submitted,

                              **THE J.R. BEASON FIRM PLLC.**
                              \S\ John R. Beason III, Esq._____
                                John R. Beason III,
                                Attorney for the Plaintiffs
                                D.C. Bar No.: 1721583
                                IBA Bar No.: 1522438
                                853 McAlister St.
                                Benton Harbor, MI 49022
January 29th, 2023.                  JRBeason3@TheJRBeasonFirm.com